NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 190662-U

NO. 4-19-0662

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 27, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* N.M. and N.D., Minors | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| Petitioner-Appellee, | ) | McLean County |
| v. | ) | No. 19JA23 |
| Carmen G., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | J. Brian Goldrick, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Steigmann and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Respondent's claim challenging the trial court's shelter care order is moot where, in subsequent proceedings, respondent's children were found to be abused and properly made wards of the court. The court's dispositional order was proper where the court committed no error in making the children wards of the court and placing them in the custody and guardianship of the Illinois Department of Children and Family Services.

¶ 2   Respondent, Carmen G., appeals the trial court's shelter care order granting temporary custody of her children, N.M. (born October 22, 2017) and N.D. (born September 16, 2012), to the Illinois Department of Children and Family Services (DCFS) and the court's dispositional order making N.M. and N.D. wards of the court and placing them in the custody and guardianship of DCFS. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4        On April 8, 2019, the State filed a petition for adjudication of wardship alleging that N.M. and N.D. were abused under section 2-3(2)(v) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(2)(v) (West 2018)) and neglected under section 2-3(1)(a) of the Juvenile Court Act (705 ILCS 405/2-3(1)(a) (West 2018)). Specifically, paragraph four of the petition alleged that the children's caretaker, Khadijah Denard, abused the children by "inflict[ing] excessive corporal punishment" in that she "[held] the minor [N.M.'s] hands under hot water to the point of causing second degree burns on both of her hands" after Denard found N.M. "playing with her own feces" and the "scalding occurred in the presence of *** [N.D.] who could see and hear the baby being hurt." Paragraph five of the petition alleged N.M. and N.D. were neglected in that they were "not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under state law as necessary for the minors' well-being in that respondent mother left the minor[s] in the care of an inappropriate caretaker" and, upon learning of N.M.'s injuries, "refused to follow up with the medical care necessary *** and lied to hospital personnel that [N.M.] was in Indiana."

¶ 5        Also on April 8, 2019, a DCFS shelter care report was filed. The report summarized the investigation conducted by DCFS to determine whether N.M. had been abused on March 27, 2019, when she "sustained 2nd degree burns on both of her hands." DCFS personnel interviewed Denard about the incident. According to the report, Denard stated that she was "filling up the bathtub for herself all the way on hot" while N.M. "was sitting on the potty in the same bathroom." Denard left the bathroom briefly and, when she returned, she found N.M. "standing by the bathtub holding her hands out and her skin was wrinkly." Denard applied cold rags to N.M.'s hands and took her to the emergency room. In a later interview, Denard changed her story and admitted that

N.M. "had played in her feces and [Denard] washed her hands under running bath water." According to the report, medical personnel opined that the burns N.M. sustained "were likely caused by running water due to the pattern." The report also indicated that, throughout the course of N.M.'s medical treatment and the DCFS investigation, Denard presented herself to medical personnel, DCFS, and law enforcement as the children's mother. Once DCFS personnel learned Denard was not the birth mother, they contacted respondent.

¶ 6        The shelter care report also summarized two interviews of N.D. During the first interview, N.D. "appeared to have been coached." She "repeatedly referred to [Denard] as her mother" and "told several different versions of the event." During the second interview, N.D. stated that Denard "[wasn't] really her mother and [Denard] told [N.D.] to lie when she was interviewed and call [Denard] mom." N.D. also stated that N.M. "got burned" when Denard washed N.M.'s hands.

¶ 7        The shelter care report further summarized an interview with respondent. According to the report, respondent sent N.D. to live with Denard "because the school where [respondent] lives in Gary[,] [Indiana,] [was] not a good environment for [N.D.] and she wasn't learning or doing well." Respondent sent N.M. to live with Denard "so that she didn't separate the children." According to the report, respondent's residence was being condemned and she was attempting to obtain new housing through "Section 8." Respondent planned to stay in Bloomington through April 8 so that she could take N.M. to a follow-up appointment with a pediatrician. After the appointment, the report indicated, respondent intended to leave N.D. in Bloomington with other relatives and take N.M. back to Indiana.

¶ 8        The shelter care report also described a conversation between DCFS personnel and

a representative from the burn center in Springfield where N.M. had been taken for treatment. According to the report, the representative indicated that Denard failed to schedule a follow-up appointment on April 2, 2019, as instructed. A nurse at the burn center contacted Denard, who, according to the report, told the nurse she did not "have money to bring [N.M.] all the way to Springfield and they [weren't] bringing her." Denard then reportedly gave the phone to respondent who informed the nurse that she was the mother of N.M. and that N.M. "was already in Indiana."

¶ 9　　　　On April 8, 2019, the trial court conducted a shelter care hearing. During the hearing, respondent stipulated to probable cause but requested a hearing on whether there was an immediate and urgent necessity that N.M. and N.D. be placed in shelter care.

¶ 10　　　　The State presented no additional evidence but instead stated that it "st[ood] on the information that's already been supplied to the [trial court]," including the shelter care report.

¶ 11　　　　Respondent testified on her own behalf. She testified that she lived in Gary, Indiana, and had lived there for two years prior to the hearing. According to respondent, N.M. and N.D. had lived with Denard, respondent's cousin, since late February or early March of 2019. Respondent sent her children to live with Denard because N.D. "was failing at school." Respondent testified that she was comfortable leaving N.M. and N.D. with Denard because Denard was "an excellent person" and the children had "spent a lot of time with [her]" in the past. Respondent testified that she had provided Denard with written authorization to enroll N.D. in school in Bloomington. Respondent had also provided Denard with the children's "medical cards" because she thought this was sufficient for Denard to obtain medical care for the children if necessary.

¶ 12　　　　Respondent testified that on March 27, 2019, she learned N.M. "had suffered some burns to her hand," and respondent travelled to Bloomington on April 4. Respondent testified that

she did not go to Bloomington immediately after N.M. was injured because she was "transitioning into a home." Although her then-current housing was "appropriate" for the children to live in, the building where she lived was "closing down" in May of 2019, after which she would be moved into Section 8 housing. According to respondent, in order to qualify for Section 8 housing, she was required to attend classes, which she described as "very mandatory." Because, based on her conversations with Denard, she thought N.M. was receiving the necessary medical attention, she decided to remain in Indiana in order to attend the classes.

¶ 13　　　　When respondent arrived in Bloomington, she learned that N.M. had a scheduled follow-up medical appointment on April 8 or April 9. This was the only follow-up appointment of which respondent was aware, and she denied knowing that N.M. had missed an appointment on April 2. Respondent recalled speaking with a nurse from the burn center in Springfield on April 4. However, respondent denied that the nurse had informed her that N.M. had missed an appointment on April 2, that the nurse had informed her that she could bring N.M. in for an appointment on April 5, or that she had told the nurse that N.M. was already back in Indiana. Rather, respondent testified that, during the conversation, she told the nurse she was a resident of Indiana and "was going to call her pediatrician to go get a burn specialist so [she] could get [N.M.] treatment out in Indiana." According to respondent, if the nurse had informed respondent that she could bring N.M. for an appointment the day after the phone call, she would have taken N.M. to the appointment.

¶ 14　　　　Respondent testified she intended to remain in Bloomington until after N.M.'s appointment on April 8 or 9 and then return with her to Indiana. Respondent testified that her children had a pediatrician in Indiana. Although N.M. did not have an appointment scheduled with a burn specialist in Indiana, she had "been making plans for [N.M.] to get seen by her pediatrician"

in Indiana and then would schedule a follow-up appointment with a burn specialist there.

¶ 15    Respondent speculated that N.D. had told investigators and medical personnel that Denard was her mother "[b]ecause [Denard] is [N.D.'s] godmother." Denard told respondent she represented herself as the mother of N.M. "[b]ecause the baby would have never received medical help *** unless she had told them because [respondent] was in Indiana at the time."

¶ 16    Denard testified that on March 27, she was "washing *** poop off [N.M.'s] hands and [she] turned on the cold water and [she] turned on the hot water. And then [she] picked [N.M.] up and [she] put her *** hands under it. And as [she] continued to wash [N.M.'s] hands, the water probably got hot and she got burned like that." Denard denied that N.D. had observed Denard washing N.M.'s hands but instead only saw "the part that [N.M.'s] hands were wrinkly and I was trying to figure out what was going on." Denard admitted that she initially told a different story to medical personnel and DCFS because she "was scared and [she] didn't know what to do."

¶ 17    According to Denard, as soon as she realized something was wrong with N.M., she gave her ibuprofen and applied cold towels to her hands. She then took N.M. to a nearby urgent care center from which she was transported to Advocate BroMenn Medical Center for further treatment. The medical staff at Advocate BroMenn Medical Center scheduled a follow-up appointment for N.M. with a burn specialist in Springfield on March 28. Denard took N.M. to the appointment with the burn specialist. N.M. was subsequently seen at St. John's Children's Hospital in Springfield for additional treatment. Denard admitted she told N.M.'s medical providers she was N.M.'s mother because "that was the only way [N.M.] was going to be seen." According to Denard, she was "in regular contact" with respondent following N.M.'s injuries.

¶ 18    N.M. remained at St. John's Children's Hospital until March 29. Denard testified

that a follow-up appointment had been made for N.M. on April 2 with a pediatrician located in Bloomington and that N.M. attended that appointment. Denard testified N.M. did not miss any doctor appointments.

¶ 19     The final witness to testify at the shelter care hearing was Theresa Ciardini, a child protection investigator for DCFS. According to Ciardini, she received a "hotline report" on March 29 about potential child abuse involving N.M. and N.D. Ciardini classified the injuries suffered by N.M. as "submersion burns," which she described as "highly suspicious of abuse." After N.M. left St. John's Children's Hospital, a safety plan was initiated pursuant to which Denard would not be alone with either N.M. or N.D. and Denard's friend, Latoya, would always be present with the children.

¶ 20     On April 3, Ciardini conducted an interview with N.D. which Ciardini described as "all over the place" and "with just nothing consistent." That same day, according to Ciardini, Detective DeRosa of the Normal Police Department interviewed Denard and Denard admitted that N.M.'s hands were burned when Denard washed her hands and not because N.M. placed her hands in hot bath water. Following these interviews, Ciardini subsequently took protective custody of the children. Ciardini testified that, when she arrived at Denard's home, neither Denard nor Latoya were present with the children. Instead, Denard's boyfriend was the only adult at the residence. Before Ciardini could take further action, Denard's mother arrived and asked Ciardini "can their mother come and get them." Up until that point, Ciardini "had no idea that [Denard] was not the mother." Following this revelation, Ciardini conducted a further investigation and implemented a new safety plan, placing the children with Latoya.

¶ 21     On April 4, Ciardini conducted a second interview of N.D. During this interview,

N.D. informed Ciardini that she had repeatedly been instructed to call Denard "mom." N.D. then recounted that, on March 27, she found N.M. in the bathroom covered in feces. After N.D. told Denard, Denard washed N.M.'s hands. N.D. testified that while Denard was washing N.M.'s hands, N.M. was "screaming" and "trying to pull away."

¶ 22　　　Ciardini also testified about N.M.'s follow-up appointment with the burn specialist in Springfield which had been scheduled for April 2. According to Ciardini, she was contacted by a representative of the burn center and informed that Denard was supposed to have attended appointments on April 2 both with N.M.'s pediatrician in Bloomington and with the burn specialist. Ciardini testified that the representative had already spoken with Denard and respondent about the missed appointment. According to Ciardini, the representative was "very specific" when recounting her conversation with respondent that respondent had stated N.M. was "already in Indiana" when, in reality, "the baby was not in Indiana."

¶ 23　　　Ciardini identified the following actions as "red flag[s]" or "concern[s]" that led to the children's removal by DCFS: the "submersion burns," the burns occurring during toilet training, the different version of events provided by Denard and N.D., the violation of the safety plan, Denard claiming to be the children's mother, that respondent had never granted Denard authority to seek medical treatment for the children, that respondent waited nine days after being told about N.M.'s burns before travelling to Bloomington to check on N.M., that respondent was being transitioned to a new home, that respondent was not employed, that she had not made appointments for N.M. to be seen by an Indiana burn specialist or pediatrician, that respondent had not called any of N.M.'s treating physicians herself, and that respondent reportedly informed the burn center N.M. was in Indiana when she was actually still in Bloomington.

¶ 24    At the conclusion of the shelter care hearing, the trial court entered an order finding probable cause for the filing of the petition because "[Denard] admitted to holding [N.M.'s] hands under running water for playing in feces. Medical personnel indicate[d] this resulted in 2d degree burns on both hands. Mother then refused to follow up as directed with hospital and was not honest about [N.M.'s] whereabouts." Citing the same facts and noting respondent was "prepared to take [N.M.] to Indiana, leaving [N.D.] with the person who ha[d] abused [N.M.]" and that "[respondent's] current housing is not safe for minors," the court found immediate and urgent necessity existed to remove N.M. and N.D. from respondent's care. The court noted that "specialized care" was required for N.M. and that it was "not certain that the needs of the children, especially the youngest, [N.M.], would be met at this point in time."

¶ 25    On April 25, 2019, respondent filed a motion to reconsider the trial court's shelter care order, which the court denied following a hearing on May 16, 2019.

¶ 26    On July 31, 2019, an adjudicatory hearing was held. Ciardini testified on behalf of the State. Her testimony was consistent with her testimony at the shelter care hearing. After Ciardini's testimony, the hearing was continued to August 9, 2019.

¶ 27    On August 9, Dr. Channing Petrak testified for the State. Dr. Petrak testified that on March 29, she received a referral from DCFS to evaluate N.M. for abuse because "there [were] concerns that [her] burns were not accidental in nature." Dr. Petrak explained that the initial version of events provided by Denard, that N.M. had willingly placed her hands in hot water, did not "comport with the injuries that [N.M.] suffered" because "[t]he pattern [of the burns] *** did not appear to fit with simple emersion [*sic*] burn[s]" and because "a child will not put their hands in very hot water and sustain a burn like that and leave their hands in the hot water." Dr. Petrak

concluded that "[N.M.'s] burns were inflicted and due to child physical abuse."

¶ 28        Respondent was the last witness to testify. Her testimony was consistent with her testimony at the shelter care hearing.

¶ 29        Following the adjudicatory hearing, the trial court found that N.D. and N.M. were abused as alleged in paragraph four of the petition. Specifically, the court found that "[N.M.] suffered bilateral hand second degree burns when her hands were held under hot water by [Denard], a caregiver, when [Denard] found the child playing in feces." The court found that the State failed to prove the allegations of paragraph five, noting that respondent's "inability to be [present] clearly was financially related" and that Denard, not respondent, was responsible for missing the April 2 appointment with the burn specialist.

¶ 30        On August 21, 2019, a dispositional report and an integrated assessment were filed. The dispositional report identified four "current service plan objectives." According to the service plan, respondent was required to complete a domestic violence assessment, parenting education classes, and individual counseling. Respondent was also to cooperate with DCFS and comply with any of that agency's recommendations. The report concluded that "the underline [*sic*] concerns of why [respondent] sent her children away for better education would need to be addressed before the children return home" and that a "parenting class, domestic violence assessment[,] and home safety checklist [were] imperative steps needed to be taken in order to safely recommend the children should return to [respondent's] care."

¶ 31        The integrated assessment included a June 2019 interview of Denard. According to the assessment, Denard "would watch [N.D.] for months at a time and usually had her for the entire summer." Further, when respondent found out that she was pregnant with N.M., she reportedly

told Denard that she did not want N.M. and decided to give custody of her to Denard when she was born. Respondent changed her mind after N.M. was born, according to the report, because N.D. "liked having a little sister." The report also stated that N.M. "spent a great deal of time" in Denard's care and that respondent "had not ever been to Bloomington to visit her children from the time they came to live with [Denard] in February until the time of protective custody," although Denard had taken the children to see respondent in Chicago.

¶ 32    The integrated assessment also recounted a story Denard told of an incident of domestic violence involving respondent. According to the assessment, at a time when Denard was caring for N.D., Denard purchased a train ticket for respondent to visit Denard and N.D. in Bloomington. Respondent brought her "paramour" and his child. While respondent and her paramour were with Denard, the two were "involved in a domestic incident in [Denard's] home wherein the paramour bit [respondent] during an altercation." Denard made the paramour leave her apartment, which he did temporarily. The paramour then returned, "kicked the door in[,] and stole [Denard's] belongings."

¶ 33    The integrated assessment also detailed a telephone interview of respondent. In the integrated assessment, respondent's relationship with Brandon Darty was detailed. According to the assessment, respondent described her relationship with Darty as "good at first," although it later "became controlling and violent and there was a great deal of domestic abuse and physical abuse in their relationship." At the time the assessment was completed, an order of protection was in place against Darty and he had been incarcerated for the past two years.

¶ 34    According to the assessment, respondent had not had an authorized visit with her children since they were taken into protective custody, although she had been offered two visits

by DCFS. Respondent rejected these offers, initially because "she did not want to come to Illinois to visit the children," but later because she was "never amenable to the times of the train schedules."

¶ 35        The integrated assessment concluded that respondent's actions "indicate a lack of attachment and empathy for her children as well as lack of protective capacity as a parent and primary caregiver to the children." In support of this conclusion, the assessment cited the following facts: that respondent left her children with Denard for extended periods of time in the past, that respondent had expressed a desire to give N.M. to Denard to raise, that respondent did not appreciate the significance of separating N.M. from her mother, *i.e.*, respondent, that respondent did not attempt to visit her children or inspect their living conditions while they were in Bloomington, and that respondent did not respond to N.M.'s injuries with a sense of urgency. The integrated assessment stated that respondent could suffer from a "mood disorder or depressive disorder" affecting her ability to care for her children, but her being "highly guarded and defensive" during the interview made it difficult to definitively assess her "current functioning and abilities." The integrated assessment concluded that respondent "appears to minimize her role as parent to the children *** and her lack of empathy and attachment to her children suggests ongoing safety concerns in her ability to ensure safe and appropriate caregivers and stability for her children."

¶ 36        The integrated assessment recommended that a referral be made to Interstate Compact Services to provide respondent with appropriate services in Indiana, that respondent attend an "intensive parenting program," that respondent engage in individual psychotherapy, and that respondent receive domestic violence support services.

¶ 37    On August 28, 2019, a dispositional hearing was held. Neither party presented evidence at the hearing. Each party made arguments based upon statements and recommendations made in the dispositional report and the integrated assessment, and each party agreed that returning N.M. and N.D. to respondent within 12 months was the appropriate goal. The trial court found "there are issues that need to be addressed as laid out in the dispositional report. Again, the integrated assessment is referenced ***." The court further stated, "there are still services that are required pursuant to the integrated assessment that was completed and the report that was completed." The court entered a written dispositional order in which it found respondent "unfit to care for, protect, train, educate, supervise or discipline the minor(s) and placement with her is contrary to the health, safety and best interest of the minor(s) because [respondent] must demonstrate the ability to safely parent the minors and complete all recommended services including parenting class, domestic violence treatment, and counseling." The court further found that reasonable efforts and services toward reunification of the children with respondent could not prevent the "necessity for removal" and that removal was in the children's best interest because respondent "must complete services and demonstrate safe and appropriate parenting skills and complete all recommended services." The court made N.M. and N.D. wards of the court, placed them in the custody of DCFS, and set a permanency goal of "return home within twelve months."

¶ 38    On September 24, 2019, respondent filed a notice of appeal. The notice was captioned "In the interest of N.M., a Minor Carmen G., Appellant" and numbered 19JA23. The notice stated that respondent "appeals the Dispositional Order entered 28 August 2019; the Adjudicatory Order entered 9 August 2019; and the Temporary Custody Order entered 8 April 2019" and requested that this court "vacate, reverse, or remand the aforementioned decision[s]."

¶ 39        This appeal followed.

¶ 40                            II. ANALYSIS

¶ 41                            A. Jurisdiction

¶ 42        As a preliminary matter, the State argues that respondent failed to comply with Illinois Supreme Court Rule 303(b)(2) (eff. July 1, 2017) and, thus, we lack jurisdiction to review the trial court's actions with respect to N.D. because the caption of respondent's notice of appeal only referenced N.M. and McLean County case No. 19-JA-23, the case involving N.M., and did not reference N.D. or McLean County case No. 19-JA-24, the case involving N.D. We disagree.

¶ 43        Illinois Supreme Court Rule 303(b)(1)(ii) (eff. July 1, 2017) requires that the caption of a notice of appeal "bear the title of the case, naming and designating the parties in the same manner as in the circuit court and adding the further designation 'appellant' or 'appellee,' *e.g.*, 'Plaintiff-Appellee.' " Rule 303(b)(2) requires that the notice of appeal "specify the judgment or part thereof or other orders appealed from and the relief sought from the reviewing court." Ill. S. Ct. R. 303(b)(2) (eff. July 1, 2017).

¶ 44        Our supreme court has noted that, "[u]nless there is a properly filed notice of appeal, a reviewing court has no jurisdiction over the appeal and is obliged to dismiss it." *People v. Smith*, 228 Ill. 2d 95, 104, 885 N.E.2d 1053, 1058 (2008). In *Smith*, the supreme court further found that,

> "[W]hile a notice of appeal is jurisdictional, it is generally accepted that such a
> notice is to be construed liberally. [Citation.] The purpose of a notice of appeal is
> to inform the prevailing party in the trial court that the other party seeks review of
> the judgment. [Citation.] Accordingly, notice should be considered as a whole and

will be deemed sufficient to confer jurisdiction on an appellate court when it fairly and adequately sets out the judgment complained of and the relief sought, thus advising the successful litigant of the nature of the appeal. [Citation.] Where the deficiency in notice is one of form, rather than substance, and the appellee is not prejudiced, the failure to comply strictly with the form of notice is not fatal." (Internal quotation marks omitted.) *Id*. at 104-05.

¶ 45 The defects in respondent's notice of appeal do not require dismissal of her claim. We note the only substantive order of the trial court that referenced McLean County case No. 19-JA-24 was the temporary custody order. The adjudicatory order and the dispositional order, both of which addressed N.M. *and* N.D., only referenced McLean County case No. 19-JA-23. More importantly, respondent's notice clearly set out the three judgments that she challenges and states the relief sought: respondent clearly referenced the dispositional order, the adjudicatory order, and the temporary custody order, provided the date of each order, and requested that we "vacate, reverse, or remand the aforementioned decision[s]." Because the relevant judgments were identified in the notice of appeal and these judgments affected respondent's relationship with both of her children, the State cannot argue it was unaware of the relief sought by respondent or that it was prejudiced in some way by the technical defects in respondent's notice.

¶ 46 B. Temporary Custody Order

¶ 47 Respondent contends no evidence was presented during the shelter care hearing that "suggested that N.M.'s and N.D.'s safety and welfare could not be safeguarded by reasonable efforts if they were restored to [respondent's] custody at the time of the shelter care hearing." We find this issue to be moot.

- 15 -

¶ 48    At a shelter care hearing, the trial court determines if probable cause was shown "to believe that the minor is abused, neglected or dependent." 705 ILCS 405/2-10(1), (2) (West 2018). "If the court finds that the evidence presented supports a finding of probable cause, it must then determine whether it is consistent with the minor's health, safety, and best interests that she be released to her parents or placed in shelter care." *In re J.W.*, 386 Ill. App. 3d 847, 851-52, 898 N.E.2d 803, 807 (2008) (citing 705 ILCS 405/2-10(2) (West 2006)). "Essentially, at a shelter-care hearing, the court determines whether a minor requires temporary placement outside the home." (Internal quotation marks omitted.) *Id.* at 852.

¶ 49    "An appeal is considered moot where it presents no actual controversy or where the issues involved in the trial court no longer exist because intervening events have rendered it impossible for the reviewing court to grant effectual relief to the complaining party." *In re J.T.*, 221 Ill. 2d 338, 349-50, 851 N.E.2d 1, 7-8 (2006). " 'Generally, an appeal of findings made in a temporary custody hearing is moot where there is a subsequent adjudication of wardship supported by adequate evidence.' " *J.W.*, 386 Ill. App. 3d at 852 (quoting *In re Edward T.*, 343 Ill. App. 3d 778, 792, 799 N.E.2d 304, 315 (2003)).

¶ 50    In this case, subsequent to the shelter care hearing and resulting temporary custody order, the trial court found that N.M. and N.D. were abused. Respondent does not challenge the propriety of that finding. The court later entered an order making N.M. and N.D. wards of the court and placing custody and guardianship of the children with DCFS. As further described below, the court's dispositional order was supported by adequate evidence. Thus, even if we were to review respondent's claim and find that the court's temporary custody order was improper, there would be no relief available to respondent because, pursuant to the dispositional order, DCFS would still

- 16 -

retain custody of the children. See *In re A.D.W.*, 278 Ill. App. 3d 476, 480, 663 N.E.2d 58, 61 (1996). Therefore, respondent's contentions relating to the temporary custody order are moot.

¶ 51                                   C. Dispositional Order

¶ 52        We next address respondent's claim the trial court erred in its dispositional order. We note here that although respondent also appealed from the adjudicatory order, she presents no argument in her brief that the court erred in its entry.

¶ 53        Under the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2018)) a court employs a two-step process in determining whether a minor should be made a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 18, 981 N.E.2d 336. The first step is the adjudicatory hearing, at which the court considers whether the minor is abused, neglected, or dependent. *Id.* ¶ 19 (citing 705 ILCS 405/2-18(1) (West 2010)). The second step in deciding whether to make a minor a ward of the court is the dispositional hearing. *Id.* ¶ 21 (citing 705 ILCS 405/2-21(2) (West 2010)).

¶ 54        "At the dispositional hearing, the trial court determines whether it is consistent with the health, safety[,] and best interests of the minor and the public that the minor be made a ward of the court." *Id.* If the minor "is to be made a ward of the court, the court shall determine the proper disposition best serving the health, safety and interests of the minor and the public." 705 ILCS 405/2-22(1) (West 2018). "Prior to committing a minor to the custody of a third party, such as DCFS, a trial court must first determine whether the parent is unfit, unable, or unwilling to care for the child, *and* whether the best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." (Emphasis in original). *In re M.M.*, 2016 IL 119932, ¶ 21, 72 N.E.3d 260 (citing 705 ILCS 405/2-27(1) (West 2012)). To that end, the Juvenile Court Act specifically provides as follows:

"If the court determines and puts in writing the factual basis supporting the determination of whether the parents, guardian, or legal custodian of a minor adjudged a ward of the court are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents, guardian or custodian, the court may at this hearing and at any later point:

* * *

(d) ***commit the minor to [DCFS] for care and service [.]" 705 ILCS 405/2-27(1) (West 2018).

¶ 55        "[T]he term 'unfit' in the section [of the Juvenile Court Act] relating to removing custody and guardianship from a parent following a finding of neglect differs in meaning from the unfitness required to be found for termination of parental rights for purposes of appointing a guardian with consent to adopt." *In re T.B.*, 215 Ill. App. 3d 1059, 1061, 574 N.E.2d 893, 895 (1991). For dispositional purposes, the State must prove parental unfitness by a preponderance of the evidence. *In re A.P.*, 2013 IL App (3d) 120672, ¶ 15, 988 N.E.2d 221. On review, the trial court's dispositional decision "will be reversed only if the findings of fact are against the manifest weight of the evidence or the court committed an abuse of discretion by selecting an inappropriate dispositional order." *J.W.*, 386 Ill. App. 3d at 856.

¶ 56        In its written dispositional order, the trial court found that respondent was unfit and that the children's placement with her was contrary to their health, safety, and best interest because respondent had yet to "demonstrate the ability to safely parent the minors and complete all

recommended services including parenting class, domestic violence treatment, and counseling." The court elaborated in its oral ruling, stating "there [were] still services that [were] required pursuant to the integrated assessment that was completed and the [dispositional] report."

¶ 57 Respondent first argues that the trial court's "bare conclusion" contained in the written order "does not satisfy the statutory requirement of a factual basis."

¶ 58 "[T]he writing requirement contained in section 2-27(1) exists to give the parties notice of the reasons forming the basis for the removal of the child and to preserve this reasoning for appellate review." *In re Madison H.*, 215 Ill. 2d 364, 374, 830 N.E.2d 498, 505 (2005). "[A]n oral finding on the record may satisfy section 2-27(1), provided that it is explicit and advises the parties of the basis for the court's decision." *Id.* at 377. If a trial court fails to comply with this requirement, the matter should be remanded for more specific findings. See *id.* at 378.

¶ 59 We find that the court's written finding and oral statement that respondent was required to complete services and demonstrate safe parenting complied with the Juvenile Court Act. They put respondent on notice that she was found unfit because she had yet to demonstrate the ability to safely parent the children and due to the outstanding services recommended in the integrated assessment and dispositional report.

¶ 60 Respondent next argues that the court's "conclusion that [respondent] was in need of services [is against] the manifest weight of the evidence offered at the dispositional hearing, which did not clearly reveal any deficiencies in [respondent's] parenting ability." According to respondent, the recommendation that respondent engage in domestic violence treatment was unsupported because respondent was not in a relationship involving domestic abuse at the time of the dispositional hearing and had obtained an order of protection against a prior abuser.

Respondent further argues that the recommendation that respondent attend parenting education classes was unsupported because this recommendation "appear[ed] to be based exclusively on [respondent's] tone of voice during a long-distance telephone interview" and "[n]o logical connection was presented in the assessment or at the hearing between [respondent's] alleged emotional detachment and any lack of 'qualities or skills' related to parenting."

¶ 61 Contrary to respondent's contention, the integrated assessment recommended that respondent receive domestic violence services because *two* of respondent's prior relationships involved domestic violence. Although respondent obtained an order of protection against the perpetrator from her first relationship, respondent later entered into a relationship in which she again was the victim of domestic violence. The incident of domestic violence involving the second abuser which was documented in the integrated assessment occurred in the same apartment where N.D. was living.

¶ 62 Similarly, the integrated assessment recommended that respondent attend parenting classes because she left her children with Denard for extended periods of time in the past, had expressed a desire to give N.M. to Denard to raise, did not appreciate the significance of separating N.M. from respondent, did not attempt to visit her children or inspect their living conditions while they were living in Bloomington, and did not respond to N.M.'s injuries with a sense of urgency. The integrated assessment concluded that respondent "appear[ed] to minimize her role as parent to the children *** and her lack of empathy and attachment to her children suggests ongoing safety concerns in her ability to ensure safe and appropriate caregivers and stability for her children."

¶ 63 The trial court's finding that respondent was unfit because she had not completed recommended services was not against the manifest weight of the evidence. The finding was based

upon the recommendations and facts contained in the integrated assessment and the dispositional report; these documents clearly detailed deficiencies in respondent's parenting ability and explained why, because of these deficiencies, it was recommended that respondent complete services, attend parenting classes, and receive therapy.

¶ 64        Because the trial court properly found respondent unfit for a reason other than financial circumstances alone and, further, that N.M.'s and N.D.'s health, safety, and best interests would be jeopardized if they remained with respondent, the court was permitted to commit the children to DCFS and, thus, its dispositional order was not an abuse of discretion.

¶ 65                                III. CONCLUSION

¶ 66        For the reasons stated, we affirm the trial court's judgment.

¶ 67        Affirmed.