898 N.E.2d 803 (2008)
In re J.W., a Minor,
The People of the State of Illinois, Petitioner-Appellee,
v.
David Weaver and Sarah Weaver, Respondents-Appellants.
No. 4-08-0489.
Appellate Court of Illinois, Fourth District.
December 1, 2008.
*805 Justice STEIGMANN delivered the opinion of the court:
In March 2008, the State filed a petition for adjudication of wardship, alleging that J.W. (born January 4, 2008), the minor child of respondents, David and Sarah Weaver, was a neglected minor in that her environment was injurious to her welfare, pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3 (1)(b) (West 2006)). Following a May 2008 adjudicatory hearing, the trial court adjudicated J.W. a neglected minor. Following a June 2008 dispositional hearing, the court adjudicated J.W. a ward of the court and appointed the Department of Children and Family Services (DCFS) as her guardian.
The Weavers appeal, arguing that the trial court erred by (1) failing to consider alternatives to placing J.W. in shelter care, (2) finding Sarah neglectful at the adjudicatory hearing, and (3) adjudicating J.W. a ward of the court and appointing DCFS as her guardian. We disagree and affirm.

I. BACKGROUND
On March 24, 2008, the State filed a petition for adjudication of wardship, alleging that J.W. was a neglected minor under section 2-3(1)(b) of the Act in that while residing with her parents, David and Sarah Weaver, J.W. received numerous bruises on various parts of her body that would not ordinarily exist except for the acts or omissions of a parent or custodian. Following a shelter-care hearing conducted the next day, the trial court found that because the Weavers failed to explain the origin of the bruises and marks J.W. sustained while she was in their care, an immediate and urgent necessity required J.W.'s placement in shelter care.

A. The Evidence Presented at the Adjudicatory Hearing
A summary of the evidence presented at the May 2008 adjudicatory hearing, which included testimony, in pertinent part, from (1) a DCFS investigator, (2) an emergency room physician, (3) a family relative, and (4) David, shows the following.
After a March 21, 2008, verbal argument, the Weavers agreed that David and J.W. would spend the night at David's parents' home. The next day, Sarah went to a family function at David's grandparents' home. David and J.W. arrived shortly thereafter. At that gathering, David's cousin, Debra McAdams, noticed bruises on J.W.'s back. McAdams later changed J.W.'s diaper and noticed a large, long, and dark bruise on J.W.'s waistline and thigh. After McAdams confronted Sarah about the bruises, Sarah became upset and responded that she (1) did not know how the bruising occurred and (2) thought it was possible that David was "too rough" with J.W. McAdams and Sarah then took J.W. to the hospital emergency room for an examination without informing David.
Emergency room physician Worlani Nutekor examined J.W. and found bruising on her back, abdomen, and thigh. Nutekor opined that J.W.'s injuries were (1) inflicted at the same time, (2) two or more days old based on the color of the bruises, and (3) not self-inflicted. Nutekor acknowledged that the ability to estimate the age of an injury based on the color of the bruise (1) depended upon an individual's skin density and immune system and (2) could not be 100% correct in all cases.
Based on J.W.'s injuries, the hospital contacted DCFS. DCFS investigator Nancy Britton took pictures of J.W.'s injuries, which revealed bruising on J.W.'s forearms, wrist, leg, and abdomen. Britton described J.W.'s injuries as "line bruising" on her back and arms with a particularly dark bruise on her leg. Britton interviewed the Weavers separately, *806 but neither offered any explanation for J.W.'s bruises except that J.W. "sucks on her arms and wrists." David informed Britton that he did not notice any bruising before Sarah brought J.W. to the emergency room, despite having changed J.W.'s diaper about five times while he was at his parents' home. Based on her five years of experience, Britton opined that J.W.'s injuries were not self-inflicted. However, Britton acknowledged that it was possible that the bruising on J.W.'s arms and hands could have been caused by J.W. sucking her hands and wrists. (Britton took protective custody of J.W. at the hospital and placed her with David's parents.)
After considering the evidence and counsel's arguments, the trial court determined that J.W. was a neglected minor in that her environment was injurious to her welfare under section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2006)). Specifically, the court found that (1) J.W. "suffered a significant number of bruises without any credible explanation" and (2) J.W.'s "age and physical abilities at the time [did] not support the notion of self-inflicted injuries."

B. The Evidence Presented at the Dispositional Hearing
At the June 2008 dispositional hearing, the trial court admitted into evidence a dispositional report prepared by Catholic Charities caseworker Jeanna Mulford. Mulford's report outlined, in pertinent part, the following five initial client-service plan goals for David and Sarah: (1) maintain housing and a legal means of employment; (2) participate in (a) substance-abuse assessment and random drug screens, (b) family counseling to address conflict resolution and communication skills, and (c) parenting classes; and (3) cooperate with Catholic Charities.
Mulford's report assessed the Weavers as cooperative participants who made regular contact and attended all their appointments with her. The Weavers continued to live together in their home, which Mulford described as clean with no safety concerns. The Weavers completed (1) parenting classes and (2) their initial drug screening, which produced negative results. However, Mulford was not certain whether the Weavers attended their initial family-counseling session that was rescheduled due to a conflict with their respective work schedules. Specifically, Mulford's report indicated that the Weavers were hesitant to inform their family counselor of scheduling conflicts so that their appointments could be rescheduled. In addition, the Weavers were on a waiting list to complete their substance-abuse assessments. Mulford recommended that the permanency goal should be to return J.W. to the Weavers' custody within 12 months.
Sarah testified that she was willing to attend family counseling but that the family counselor initially assigned to her case was unavailable. In an attempt to accommodate her and David's work schedules, Sarah contacted five different family counselors but was unsuccessful. Sarah stated that (1) with the exception of the bruises on J.W.'s wrists, she did not see any other bruises before David traveled with J.W. to his parents' home and (2) Sarah did not inform David that she was taking J.W. to the emergency room because she was afraid he would react badly, given that he was raised in an abusive family.
In his closing argument, the Weavers' counsel stated, in part, the following:
"[W]e're in a court in Logan County. We're not in the Soviet Union. This case isn't going to make the papers. It's not going to be headlines anywhere. But for Sarah * * * it's the single most important thing in her [life] right now is that [J.W.] has been taken from her, and *807 if I'm rightand the doctor said I very well could bethat the injuries happened after * * * [J.W.] and David left * * *, and [Sarah] is without [J.W.] for zero reason, no reason, it's legalized kidnapping. DCFS came in. They took [J.W.]. There just isn't any reason. And so * * * because we can't say for sure when it happened, we've taken [J.W.] away from [Sarah].
And now the State is proposing that we take [J.W.] away, with a goal of another year away. Another year that [Sarah is] going to be without [J.W.]. * * *
I [cannot] express in the strongest terms how I feel that this is just abominably unfair."
In announcing its findings, the trial court stated the following:
"I appreciate attorneys participating in rhetoric, but this is not legalized kidnapping. * * * [T]here's a huge difference, and due process is the primary difference. This isn't kidnapping.
You want to talk about abominably unfair? It's abominably unfair that some precious little child has injuries that no one can explain. That's abominably unfair. Someone in this world knows how those injuries got there, and there's [sic] two people in this courtroom [who] are supposed to know. There's [sic] two people in this courtroom that are responsible for the welfare of [J.W.]. And when injuries like that occur and there is no good explanation, that's neglect. * * * I have no intention of allowing this child to be reinjured, and that is my goal.
I am finding that both parents are unfit at this time given the unexplained injuries that could not have occurred but for the abuse and neglect of this child."
This appeal followed.

II. ANALYSIS
The Weavers argue that the trial court erred by (1) failing to consider alternatives to placing J.W. in shelter care, (2) finding Sarah neglectful at the adjudicatory hearing, and (3) adjudicating J.W. a ward of the court and appointing DCFS as her guardian. We address the Weavers' contentions in turn.

A. The Trial Court's Determination at the Shelter-Care Hearing
The Weavers argue that the trial court erred by failing to consider alternatives to placing J.W. in shelter care. Specifically, they contend that (1) the court did not comply with the Act's requirements that (a) J.W. appear before the court within 48 hours after being taken into temporary protective custody (705 ILCS 405/2-9(1) (West 2006)) and (b) DCFS document the reasonable efforts that were made to prevent or eliminate the necessity of J.W.'s removal from their custody (705 ILCS 405/2-10 (2) (West 2006)) and (2) J.W. did not have to be removed from their custody. Thus, the Weavers assert that the court's determination that J.W.'s health, safety, and best interests required her placement in shelter care must be reversed, necessitating the immediate return of J.W. to their custody. We conclude that the Weavers' contentions are moot.
At a shelter-care hearing, the trial court determines if probable cause was shown "to believe that the minor is abused, neglected[,] or dependent." 705 ILCS 405/2-10(1), (2) (West 2006). If the court finds that the evidence presented supports a finding of probable cause, it must then determine whether it is consistent with the minor's health, safety, and best interests that she be released to her parents or placed in shelter care. 705 ILCS 405/2-10(2) (West 2006). "Essentially, at a shelter-care hearing, the court determines *808 whether a minor requires temporary placement outside the home." In re Ivan H., 382 Ill.App.3d 1093, 1099, 321 Ill.Dec. 882, 890 N.E.2d 604, 610 (2008).
"`An appeal is considered moot where it presents no actual controversy or where the issues involved in the trial court no longer exist because intervening events have rendered it impossible for the reviewing court to grant effectual relief to the complaining party.'" Ivan H., 382 Ill. App.3d at 1100, 321 Ill.Dec. 882, 890 N.E.2d at 611, quoting In re J.T., 221 Ill.2d 338, 349-50, 303 Ill.Dec. 103, 851 N.E.2d 1, 7-8 (2006). "Generally, an appeal of findings made in a temporary custody hearing is moot where there is a subsequent adjudication of wardship supported by adequate evidence." In re Edward T., 343 Ill.App.3d 778, 792, 278 Ill. Dec. 586, 799 N.E.2d 304, 315 (2003).
In this case, we conclude that the Weavers' contentions are not justiciable because (1) as we discuss below, the State presented ample evidence to support the trial court's findings at the adjudicatory and dispositional stages and (2) they were subsumed into the ultimate judgment before this courtnamely, the best interest of J.W. See In re Austin W., 214 Ill.2d 31, 45-46, 291 Ill.Dec. 280, 823 N.E.2d 572, 581 (2005) (question of "whether a change in circumstances warranting modification of the dispositional order has occurred" is not justiciable because it was subsumed into the paramount issuethe best-interest inquiry).

B. The Trial Court's Determination at the Adjudicatory Hearing
The Weavers also argue that the trial court erred by finding Sarah neglectful at the adjudicatory hearing. However, we conclude that we need not review this contention in the context of the adjudicatory hearing.

1. The Purpose and Focus of the Adjudicatory Hearing

This court has previously addressed the same argument that the Weavers now make. In In re R.B., 336 Ill.App.3d 606, 612-13, 271 Ill.Dec. 182, 784 N.E.2d 400, 405-06 (2003), the respondent father appealed the trial court's finding that his child, R.B., was a neglected minor under section 2-3(1)(b) of the Act. Specifically, the respondent father argued, in pertinent part, that the evidence presented at the adjudicatory hearing was insufficient to prove he was "guilty" of child neglect. In affirming the trial court's ruling, this court stated the proper purpose and focus of the adjudicatory hearing as follows:
"Section 2-3 of the Act defines neglected children as those who live under certain conditions, such as, * * * a minor under 18 years of age `whose environment is injurious to his or her welfare' [citation], or * * * a minor `who is not receiving the proper or necessary support' [citation]. These definitions do not address the question of who may be responsible for such adverse conditions because, in the first instance, that question does not matter. What matters initially is only whether the child is neglected because these conditions exist. After all, the Act's mandate is to protect children, not to assign blame to parents. If the State proves the neglect allegation, then causationand remediation can and should be addressed by the trial court at the dispositional hearing." R.B., 336 Ill.App.3d at 614-15, 271 Ill. Dec. 182, 784 N.E.2d at 407.
In explaining the rationale underlying the irrelevancy of determining causation at the adjudication hearing, this court posed three hypothetical scenarios, one of which is remarkably similar to the facts of this case:

*809 "[C]onsider the case in which the State alleges that a 1 1/2-year-old child is abused because she suffered physical injury, by other than accidental means, which caused impairment of her physical health. The State's petition alleges the child suffered multiple and deep bruises, as well as welts, over several months, indicative of excessive corporal punishment. Assume further that because the State does not know who inflicted this punishment, its abuse petition merely alleges that it was inflicted `by a parent or immediate family member or any other person who is in the same family or household as the child.' [Citation.] Further, assume at the adjudicatory hearing that the State is able to prove, through medical testimony, the allegations that this 1 1/2-year-old child suffered multiple and deep bruises and welts over several months but is not able to prove who caused the child's injuries. Each parent and the other members of the household testify that they were not responsible for the child's injuries. * * * [T]he respondent parents in this hypothetical could argue to the trial court at the adjudicatory hearing that they should not be found `guilty' of child abuse. Yet, on these facts, the State would have proved to a moral certainty that this child was an abused minor * * * because (1) the child suffered the injuries as alleged and (2) someone who is a parent, immediate family member, or other member of the child's household is responsible for these injuries.
Surely, the legislature that drafted section 2-3 of the Actas well as the publicwould be outraged and view as bizarre a trial court's ruling at the conclusion of the adjudicatory hearing in this hypothetical case that the child involved was not an abused minor because the State had not proved who was responsible for the abuse. The fact that the State cannot prove causation makes the child no less abused and no less needful of court intervention to both protect her and assure that the abuse stop." (Emphasis in original.) R.B., 336 Ill.App.3d at 615-16, 271 Ill.Dec. 182, 784 N.E.2d at 407-08.
See also In re Arthur H., 212 Ill.2d 441, 467, 289 Ill.Dec. 238, 819 N.E.2d 734, 749 (2004) (citing, approvingly, the three hypothetical scenarios this court posed in R.B.).

2. The Weavers Claim That the Trial Court Erred by Finding Sarah Neglectful at the Adjudicatory Hearing

The Weavers' base their argument that the trial court erred by finding Sarah neglectful at the adjudicatory hearing on the following contention: although they "have (reluctantly) opted not to challenge * * * the trial court's adjudication of J.W. as a neglected minor," the "court's finding that both David and Sarah were responsible for [J.W.'s] neglect was both wrong and reversible." (Emphasis in original.) However, the Weavers' contention misapprehends the purpose and focus at the adjudicatory-hearing stage of a petition for adjudication of wardship. Essentially, the Weavers argue, as did the respondent father in R.B., that the evidence presented at the adjudicatory hearing was insufficient to prove that Sarah was "guilty" of child neglect.
As we have previously indicated, "the purpose of juvenile court proceedings is to determine the status of the child on whose behalf the proceedings are brought, not to determine any particular person's criminal or civil liability." (Emphases in original.) R.B., 336 Ill.App.3d at 614, 271 Ill.Dec. 182, 784 N.E.2d at 407. See Arthur H., 212 Ill.2d at 467, 289 Ill.Dec. 238, 819 N.E.2d at 749 (the adjudicatory hearing determines "whether the child is neglected, and not whether the parents are neglectful"). *810 Despite this distinction, section 2-21(1) of the Act mandates the following:
"If the court finds that the minor is abused neglected, or dependent, the court shall then determine and put in writing the factual basis supporting that determination, and specify, to the extent possible, the acts or omissions or both of each parent, guardian, or legal custodian that form the basis of the court's findings." (Emphasis added.) 705 ILCS 405/2-21(1) (West 2006).
At the conclusion of the evidence and argument at the adjudicatory hearing in this case, the trial court stated, in pertinent part, the following:
"So I find that [J.W.] is in an environment that is injurious to her welfare. [J.W.] suffered a significant number of bruises without any credible explanation, and [J.W.'s] age and physical ability at the time do not support the notion of self-inflicted injuries. I find that neglect has been imposed by both parents. They both had a duty to prevent it. They were both around [J.W.]."
Thus, the Weavers' contention is not correct that the trial court "may, but is not required to, seek to determine (by a preponderance of the evidence) which of the parents, or both were responsible for the neglect." Instead, after the court determined that J.W. was a neglected minor, section 2-21(1) of the Act required the court to specify, to the extent possible, the Weavers' acts or omissions that formed the basis of its determination. The presence of the phrase "to the extent possible" means that the legislature was aware that in some abuse or neglect cases, a court might not be able to specify the parents' act or omissions that form the basis of the court's findings. Yet, in those circumstances, the child at issue is no less abused or neglected.
The legislature directed the trial court to try to specify at the adjudicatory hearing the parents' acts or omissions that form the basis of the court's finding of abuse or neglect so as later to inform the court regarding its options when it conducts the dispositional hearing. Thus, section 2-23(1)(a) of the Act, dealing with dispositional orders, provides as follows:
"[C]ustody of the minor shall not be restored to any parent, guardian[,] or legal custodian whose acts or omissions or both have been identified, pursuant to subsection (1) of [s]ection 2-21, as forming the basis for the court's finding of abuse or neglect, until such time as a hearing is held on the issue of the best interests of the minor and the fitness of such parent, guardian[,] or legal custodian to care for the minor without endangering the minor's health or safety, and the court enters an order that such parent, guardian[,] or legal custodian is fit to care for the minor." 705 ILCS 405/2-23 (1)(a) (West 2006).
This mandated hearing could well occur at the dispositional hearing itself. The point of section 2-23(1)(a) is to remind the court that it had previously found problems with a parent's treatment of a child whose custody that same parent is then seeking.
A trial court's finding under section 2-21(1) of the Act does not adjudicate a parent or guardian "guilty" but, instead, constitutes simply one of the numerous factors that the court will consider at the later dispositional hearing. And even if a court never made such a finding at the adjudicatory hearing, nothing bars the court from determining causationand, subsequently, remediationat the dispositional hearing.
In sum, we conclude that the trial court's finding that "neglect had been imposed by both parents" is not necessary to its earlier finding that the child was neglected. *811 Because, as we explained, this finding merely serves to inform the court when the proceedings reach the dispositional hearing (and then becomes one of several factors for the court to consider), we decline to review the correctness of that finding in our review of the proceedings at the adjudicatory stage.

C. The Trial Court's Determination at the Dispositional Hearing
The Weavers next argue that the trial court erred by adjudicating J.W. a ward of the court and appointing DCFS as her guardian. We disagree.
In any proceeding initiated pursuant to the Act, the paramount consideration is the best interest of the child. Arthur H., 212 Ill.2d at 464, 289 Ill.Dec. 238, 819 N.E.2d at 747. Section 2-22(1) of the Act, which governs dispositional hearings, states as follows:
"At the dispositional hearing, the court shall determine whether it is in the best interests of the minor and the public that he be made a ward of the court, and, if [so], the court shall determine the proper disposition best serving the health, safety[,] and interests of the minor and the public. The court also shall consider the permanency goal set for the minor, the nature of the service plan for the minor[,] and the services delivered and to be delivered under the plan. All evidence helpful in determining these questions, including oral and written reports, may be admitted and may be relied upon to the extent of its probative value, even though not competent for the purposes of the adjudicatory hearing." 705 ILCS 405/2-22(1)(West 2006).
Under section 2-27 of the Act, the trial court may appoint DCFS as guardian of the minor if it determines that the parents are unfit or unable, for reasons other than financial circumstances alone, "to care for, protect, train[,] or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of * * * her parents." 705 ILCS 405/2-27(1) (West 2006). The court's decision will be reversed only if the findings of fact are against the manifest weight of the evidence or the court committed an abuse of discretion by selecting an inappropriate dispositional order. In re Ta.A., 384 Ill.App.3d 303, 307, 322 Ill.Dec. 743, 891 N.E.2d 1034, 1037-38 (2008).
Our review of the record in this case shows that the trial court's decisions at the dispositional hearing (1) that the Weavers were unfit, (2) adjudicating J.W. a ward of the court, and (3) appointing DCFS as J.W.'s guardian were not against the manifest weight of the evidence. In addition, J.W.'s subsequent placement with David's parents was not an abuse of discretion under the circumstances. See 705 ILCS 405/2-27 (1)(a) (West 2006) (after a finding of unfitness at the dispositional hearing, the court may place the minor in the custody of a suitable relative as legal custodian or guardian). We also agree completely with the court's remarks regarding the unfitness of both parents in this case, given, as the court explained, "the unexplained injuries could not have occurred but for the abuse and neglect of this child." And, further,
"[s]omeone in this world knows how those injuries got there, and there's [sic] two people in this courtroom [who] are supposed to know. There's [sic] two people in this court room that are responsible for the welfare of [J.W.]. And when injuries like that occur and there is no good explanation, that's neglect."
*812 In closing, we note that the trial court's findings and orders demonstrated a clear understanding of the facts at each stage of the proceedings, which this court found to be especially helpful.

III. CONCLUSION
For the reasons stated, we affirm the trial court's judgment.
Affirmed.
McCULLOUGH, P.J., specially concurs.
TURNER, J., dissents.
Presiding Justice McCULLOUGH, specially concurring:
I concur in this opinion.
In upholding the trial court's decision, I believe it is important to note that respondents, David and Sarah, are living together and are responsible for each other's actions insofar as this neglect proceeding is concerned. This is not a case where the two parents are living separate and apart. Although there is evidence that Sarah has worked hard to show she is a good parent, Sarah and David are living together and carry each other's burdens.
This is not in the posture of a termination of parental rights. The trial court's order sets the permanency goal at "return home in 12 months" and provides for a permanency review hearing on December 8, 2008. Sarah and David will have their opportunity to prove that a return home is appropriate.
Justice TURNER, dissenting:
I respectfully dissent from that portion of the majority opinion which affirms the trial court's dispositional order finding Sarah unfit.
Without analysis, the majority adopts the trial court's rationale for finding Sarah unfit. The majority quotes the trial court that "the unexplained injuries could not have occurred but for the abuse and neglect of the child." ___ Ill.App.3d at ___, 325 Ill.Dec. 764, 898 N.E.2d at 811. Further, "[s]omeone in this world knows how those injuries got there, and there's [sic] two people in this courtroom [who] are supposed to know." ___ Ill.App.3d at ___, 325 Ill.Dec. 764, 898 N.E.2d at 811.
While the majority opinion appropriately demonstrates how and why the above rationale supports a finding of neglect (see ___ Ill.App.3d at ___, 325 Ill.Dec. 764, 898 N.E.2d at 811), the majority errs by apparently relying on the trial court's above quotes as a sufficient basis to find Sarah unfit. I believe a more in-depth analysis is required to determine whether the trial court's unfitness finding as to Sarah was against the manifest weight of the evidence. For the reasons that follow, I would find that it was.
The majority notes that Dr. Nutekor "opined that J.W.'s injuries were (1) inflicted at the same time, (2) two or more days old based on the color of the bruises, and (3) not self-inflicted." ___ Ill.App.3d at ___, 325 Ill.Dec. 758, 898 N.E.2d at 805. However, this synopsis of Dr. Nutekor's testimony fails to fully explain Dr. Nutekor's opinion. The following is the doctor's testimony on cross-examination.
"Q [Att. Jonathan Backman:] Now, I think you just indicated that[][]well, a few minutes ago that you thought the bruises were two or more days old. Just so I'm clear on that you subsequently said they weren't fresh. They didn't happen on Saturday the day you saw the baby, right?
A [Dr. Nutekor:] That is my opinion.
Q[.] But they could have happened the prior day?
A[.] The prior day?

*813 Q[.] Yes.
A[.] That is a possibility because when we say two days in the emergency room if somebody comes in and says how many days, two days would mean yesterday and today."
In addition to the above, it was also established in cross-examination that (1) the doctor's observations of the color of the bruises were different than that of the nurse's and (2) the color of bruises can be deceptive.
The upshot of the doctor's testimony clearly establishes J.W.'s injuries may have been inflicted on J.W. the day before the doctor's examination. Thus, the injuries clearly may have been inflicted when J.W. was with David at his parents' house. In that case, Sarah could neither have caused the bruises nor had the opportunity to observe the bruises until she saw J.W. the following day. The record contains no other corroborating evidence that Sarah caused the bruises or knew of them until they were pointed out to her by McAdams. In my view, the doctor's testimony does not prove, even by a preponderance of the evidence, Sarah caused or knew of the injuries.
Moreover, I question the majority's reference to R.B.'s three hypothetical scenarios that this court posed in explaining the irrelevancy of determining causation at the adjudication stage. See ___ Ill.App.3d at ___, 325 Ill.Dec. 761-62, 898 N.E.2d at 808-09. The hypothetical quoted by the majority posits the State filed and proved a petition on behalf of a 1 1/2-year-old child who suffered unexplained, "`multiple and deep bruises, as well as welts, over several months, indicative of excessive corporal punishment.'" ___ Ill.App.3d at ___, 325 Ill.Dec. 762, 898 N.E.2d at 809, quoting R.B., 336 Ill.App.3d at 615, 271 Ill.Dec. 182, 784 N.E.2d at 407-08. The majority states the above hypothetical is "remarkably similar to the facts of this case." ___ Ill.App.3d at ___, 325 Ill.Dec. 761, 898 N.E.2d at 808. I disagree.
Initially, I note "[c]ases involving abuse, neglect[,] and wardship are sui generis; each case must be decided on its own distinct set of facts and circumstances." In re M.W., ___ Ill.App.3d ___, ___, 325 Ill.Dec. 161, 897 N.E.2d 409, 418 (2008). Further, this case is factually different from the hypothetical. Here, we have unexplained injuries that, according to the doctor, were all received at the same time. The bruises were neither severe enough to warrant treatment nor described as welts indicative of excessive corporal punishment. Most importantly, the bruises did not occur over several months, weeks, or even days. Obviously, the facts in the majority's hypothetical would support a finding of neglect, and in my view, they would also be sufficient to support a specific finding of unfitness as to both parents at the dispositional stage. However, while the facts in this case do support a finding of neglect, they simply do not support a finding of Sarah's unfitness. Unexplained, severe bruising over a several-month period is not comparable to the one-time bruises here.
Accordingly, I would find the trial court's judgment Sarah was unfit to be against the manifest weight of the evidence. Therefore, I would reverse the dispositional order and remand for a new order.
Additionally, I find the dual representation of Sarah and David troubling. Section 1-5 of the Act (705 ILCS 405/1-5 (West 2006)) gives parents the right to be represented by counsel in a juvenile proceeding. "`Implicit within the right to counsel is that such representation be effective.'" In re S.G., 347 Ill.App.3d 476, 479, 283 Ill.Dec. 405, 807 N.E.2d 1246, 1248 (2004), quoting In re Johnson, 102 *814 Ill.App.3d 1005, 1011, 58 Ill.Dec. 31, 429 N.E.2d 1364, 1370 (1981). Thus, a parent is entitled "to the `undivided loyalty' of her attorney[,]" and "counsel may not represent conflicting interests or undertake the discharge of inconsistent duties." S.G., 347 Ill.App.3d at 479, 283 Ill.Dec. 405, 807 N.E.2d at 1248, quoting In re Lackey, 71 Ill.App.3d 705, 707, 28 Ill.Dec. 352, 390 N.E.2d 519, 521 (1979). Dual representation harbors a constant potential for conflict. People v. Sims, 322 Ill.App.3d 397, 415, 255 Ill.Dec. 739, 750 N.E.2d 320, 335 (2001).
I note the trial court recognized the possibility of the conflict when, at the dispositional hearing, it sua sponte questioned David whether he might want independent counsel. When David indicated he was satisfied with sharing his attorney with Sarah, the court concluded the proceedings could go forward. However, the court's questioning of David did nothing to protect Sarah. In my view, it is clear Sarah needed her own independent attorney whose undivided loyalty was to her and her alone. Her own independent attorney would likely have pursued David differently in questioning and certainly in argument would have attacked David's credibility.