**NOTICE**
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 200291-U

NO. 4-20-0291

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 6, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.G. and F.G., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Menard County |
| Petitioner-Appellee, | ) | Nos. 19JA6 |
| v. | ) | 19JA7 |
| Michael G., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Michael L. Atterberry, |
| | | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*: Respondent's claim challenging the trial court's shelter care order is moot. The trial court's adjudicatory order finding respondent's minor children neglected was not against the manifest weight of the evidence.

¶ 2    In September 2019, the trial court entered a temporary custody order pursuant to which custody of F.G. (born April 2, 2011) and M.G. (born August 22, 2014), the minor children of respondent, Michael G., and Kailey G. (who is not a party to this appeal), was transferred to the Illinois Department of Children and Family Services (DCFS). The court subsequently entered an adjudicatory order finding F.G. and M.G. to be neglected and later entered a dispositional order. Respondent appeals, arguing the trial court erred in "finding immediate and urgent necessity" for purposes of the temporary custody order and erred in adjudicating F.G. and M.G. neglected. We

find respondent's first contention to be moot and otherwise affirm the trial court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4        On July 15, 2019, the State filed a petition for adjudication of wardship pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2018)). In its petition, the State alleged F.G. and M.G. were dependent under section 405/2-4(1)(a) of the Act and neglected under section 405/2-3(1)(b) of the Act because respondent and Kailey, who were residing in Texas, left the children in Illinois without a parent, guardian, or legal custodian and without a proper care plan. The State's petition further alleged the minors were abused under section 405/2-3(2)(v) of the Act because of respondent's "use of excessive corporal punishment with a belt." Also on July 15, 2019, the trial court conducted a shelter care hearing on the State's petition. Neither respondent nor Kailey appeared at the hearing, and in their absence, the court entered an order granting temporary custody of F.G. and M.G. to DCFS. At a subsequent status hearing which respondent and Kailey attended, the court appointed them both counsel.

¶ 5        In August 2019, Kailey's counsel filed a motion to vacate the trial court's temporary custody order and conduct a new hearing. In her motion, Kailey alleged she had not received notice of the shelter care hearing prior to July 15, 2019.

¶ 6        In September of 2019, the trial court granted Kailey's motion for a new shelter care hearing. At the second shelter care hearing, the State presented the testimony of Nichole Komnick, a DCFS investigator. During the course of her testimony, Komnick referenced a 2013 allegation of child abuse investigated by the Mississippi Department of Child Protection Services which was later determined to be "unfounded." At the end of the proceeding, the court again granted temporary custody of F.G. and M.G. to DCFS. The court found the State had established probable cause for the filing of the petition, there was an "immediate and urgent necessity" to remove F.G.

and M.G. from respondent and Kailey, and "reasonable efforts *** could not prevent or eliminate the necessity for removal[.]"

¶ 7        The trial court subsequently conducted an adjudicatory hearing. At the beginning of the hearing, the State informed the court it was withdrawing its allegation of child abuse. The State then called its first witness, Kelly Brooks, a DCFS investigator, to testify. According to Brooks, on Saturday, June 29, 2019, she received a call regarding "a mother who had no place to go with her children." Brooks drove to the home of Doretta and Jeff Fox, Kailey's parents. The call had originated from the Fox residence. After Brooks arrived, Kailey informed her "[s]he wanted to leave but [she and her children] had been brought [to Illinois] from Texas" by Doretta. When Brooks asked Kailey why Doretta brought them to Illinois, she stated respondent had "hit [the children] with a belt" leaving "marks" and "there was a case in Texas that the kids had been hurt by [respondent] and *** they had come [to Illinois] due to that report." Brooks also spoke with Doretta who informed her that, a few days prior, she had received a call from Kailey that "there was a report in Texas about abuse." According to Brooks, after Doretta spoke to Kailey on the telephone, she drove to Texas, picked up Kailey, F.G., and M.G., and brought them to her home in Greenview, Illinois. Doretta also showed Brooks photos of the children with "significant bruising." Brooks testified the photos depicted bruises on F.G.'s leg and upper thigh and on M.G.'s thigh. Although Brooks was unable to confirm when the photos were taken, she testified that Kailey had told her the bruises shown in the photos were "an accident from the incident with [respondent]." Brooks did not personally observe any bruising on F.G.'s or M.G.'s arms, legs, neck, or face but did not "check underneath the children's shorts for any bruising." Brooks also inquired about the children's medical needs. She testified that Kailey and Doretta informed her F.G. "had eight cavities that had not been filled" and neither child had a primary care doctor in

Texas. Brooks then attempted to call representatives from the Texas Department of Family and Protective Services (TDFPS) to find out more information about the abuse allegations, but because it was the weekend, she was unable to speak with anyone who could help her.

¶ 8 According to Brooks, after she had interviewed Kailey and Doretta and after she had attempted to speak with F.G. and M.G., she felt "there was no way *** [she] could ascertain safety when it came to whether the family was going to stay at [Doretta's]." Brooks explained, during her conversation with Kailey, Kailey variously expressed an intent to stay at Doretta's, to return to Texas once respondent came and picked her up, and to return to Texas and live with a friend. Brooks testified, because "there was so much information and so many unknowns that [she] could not check out on that day," she required Kailey to sign a safety plan to make sure "everybody sta[yed] put" while she conducted a more thorough investigation. Brooks testified that, under the safety plan, "[Kailey] could stay with the kids" and "if [Kailey] wanted to leave she could leave but the kids needed to stay with [Doretta] at [that] time." Brooks clarified that, although she had told Kailey she could leave Doretta's home, she had "never advised her it would be okay to return to Texas[.]"

¶ 9 Brooks also testified regarding DCFS's standard operating procedures regarding safety plans. According to Brooks, a safety plan generally remains in effect for five business days and then must be renewed. She also testified that, before a safety plan is renewed, a DCFS representative meets in person with the parents, children, and guardian that are the subject of the plan. She testified she had never renewed a safety plan over the phone, by fax, or by email, and had always had the parents sign the plan in person.

¶ 10 The State next called Komnick to testify. According to Komnick, she had taken over the DCFS investigation involving F.G. and M.G. on July 1, 2019. Komnick testified that

during the first week of her investigation, she communicated with a representative from TDFPS and Texas law enforcement about the allegation of abuse against respondent and with representatives of child welfare agencies of other states where respondent and Kailey had previously lived. By the end of that week, Komnick had determined the Texas police investigation into the abuse allegation against respondent had been closed but the TDFPS investigation was still ongoing. On July 5, Komnick met with Doretta and Jeff Fox, Kailey, F.G., and M.G. Komnick testified that, during this meeting, Kailey informed her that F.G. had "eight cavities that needed treatment," F.G. "had been prescribed [attention deficit hyperactivity disorder] medication that she was not currently on," and the children's immunizations were up-to-date. At the end of the meeting, Komnick decided to renew the safety plan Kailey had previously signed. According to Komnick, under the safety plan, F.G. and M.G. "were to reside at the home of Doretta," Kailey "was allowed to stay there [but was] not to be left alone with the children at any time and if she wanted to[,] she was able to leave." Komnick clarified that, under the safety plan, "[Kailey] could leave the [s]tate of Illinois but the children had to stay with the grandparents." However, she also testified that there was "an expectation that [Kailey] be available to renew the safety plan every five business days" and the two had agreed to meet on or before July 12 to renew the safety plan and begin working with the Intact Family Services program.

¶ 11     According to Komnick, on July 8, 2019, Kailey informed her that, on July 6, she had returned to Texas and "did not have intentions of immediately returning back." Komnick testified that Kailey's absence left the children without an "appropriate care plan," meaning Kailey had not left any information about the children's primary care physician or current medications, had not left a "consent[ ] to treat should an emergency happen," and had not left an "educational plan." Additionally, Komnick testified she requested "multiple times" that Kailey and respondent

grant Doretta a "temporary guardianship or something so that the[ ] children had a proper care plan," but Kailey and respondent refused to do so. In Kailey's absence, Komnick was unable to renew the safety plan because she was not permitted to renew the plan by phone, email, or fax. The next day, Komnick learned that TDFPS had found there was a "reason to believe" the allegations of abuse against respondent but the agency was going to close its investigation because the agency "did not *** ha[ve] the children to provide services to at the time." On July 11, 2019, Komnick decided to take protective custody of F.G. and M.G. Komnick testified "multiple factors" led to this decision, including the lack of a care plan, the allegation of abuse in Texas, the prior unfounded allegation of abuse in Mississippi, and Kailey's "report of some ongoing domestic anger management issues." After taking protective custody, Komnick placed F.G. and M.G. with Doretta and Jeff Fox.

¶ 12       The State next called Doretta Fox. According to Doretta, on June 27, 2019, she received a call and text messages from Kailey telling Doretta "[respondent] had physically abused the children" and expressing "fears [Kailey] had for the children." In response to Kailey's call, Doretta called law enforcement in Texas and requested they perform a "well child visit" and "escort [Kailey] away from the home." Doretta then drove to Texas, picked up Kailey, F.G., and M.G. from a hotel, drove them to a local TDFPS office to make a report of abuse against respondent, and then drove them all to her home in Greenview. Doretta testified that she observed "big bruises" and "big welts" on the children. According to Doretta, M.G. had "welts across his back and butt" and F.G. had "bruising on the back of her legs and her back" and a "big, deep, purple" bruise in her "groin area." Doretta described the bruises and welts as "fresh" and "brutal" and stated F.G. had told her she was "hurting" and M.G. was "still shaken" from his injuries. Doretta further testified that, shortly after Kailey arrived at the Fox's home, Kailey "had an

argument with her father and went outside and \*\*\* called a police officer" who then called DCFS.

¶ 13    According to Doretta, after Kailey returned to Texas on July 6, neither Kailey nor respondent transferred temporary guardianship of F.G. or M.G. to her or her husband. Doretta further testified neither Kailey nor respondent provided any "medical consents," contact information for the children's primary care physician or dentist, or any information about the children's medications. Doretta testified Kailey and respondent did not tell her when they would return for the children, although Kailey did tell Doretta she would "be back before school started." Although Kailey left Doretta multiple insurance cards, Doretta opined "they wouldn't have \*\*\* been any good to [her] because [she] didn't have any authorization" to take the children to the doctor. At the end of Doretta's testimony, the State rested.

¶ 14    Respondent also testified. According to respondent, he, Kailey, F.G., and M.G. had moved into a home he and Kailey purchased in Terrell, Texas, approximately a year prior to the date of the adjudicatory hearing. Respondent further testified regarding the normal methods of discipline Kailey and respondent used on their children. Respondent testified that when F.G. or M.G. misbehaved, he would make the children "[f]ace a corner, go to [their] room, [or,] depending on how serious it was[, give them] a spanking." Respondent spanked the children "maybe twice, three times out of a month" and, when he spanked the children, he had always used his "bare hand" until the incident in June 2019. Respondent testified that, on that date, he was awakened by the sound of Kailey yelling at F.G. and M.G. for misbehaving. Kailey asked respondent to "handle the situation." According to respondent, he then "grabbed a belt, wrapped it around [his] hand so about three or four inches of the flap [was] showing and [he] gave them both four spankings on the rear end." Respondent further testified that the belt was "not real thick" and that he "had the buckle tucked into the palm of his hand and his finger covering the buckle." After respondent spanked the

children, "they cried *** about five minutes *** and the[n] carried on their day." When respondent left for work a short time later, the children were "sitting on their rear ends" watching cartoons and, as he left the house, the children "came up to [him], hugged [him], [and] kissed [him] goodbye." Respondent testified, in retrospect, he was "ashamed" that he used a belt to discipline F.G. and M.G.

¶ 15 Respondent further testified that, when he returned from work on the day he spanked F.G. and M.G., the house was empty. When he tried to contact Kailey to ask her where she and the children were, she replied "the moon." Respondent did not hear from Kailey again until the next day, June 28, when she called him and told him she and the children were on their way to Illinois. Respondent testified that, by that time, police in Texas had informed him that their investigation into the allegation of abuse was "closed out" and a representative from TDFPS also informed respondent that he "didn't see any problem with" F.G. and M.G. returning home, although the representative also stated that, if Kailey and the children did return, there would be "special [measures] *** set in place." Respondent also testified that, after Kailey returned to Texas, he did not "give any sort of written consent to the Foxes to take [the children] to the emergency room or to a doctor" and did not "sign a release or guardianship to give them the ability to care for [the] children."

¶ 16 Kailey testified next. According to Kailey, she left Texas and came to Illinois "because [respondent] had spanked the children and left a bruise on them," although she described the bruises as "really small." Kailey also testified she came to Illinois "to visit with [her] family and because [her] sister had cancer." Once Kailey arrived at her parents' home in Illinois, she "became upset about how the house looked." Kailey specifically referenced "the filth and the weapons" in the house. Later, Kailey testified that when DCFS implemented the safety plan, she

understood both from the text of the document and from representations made by Komnick that she "was free to go as long as [she] left the kids with [her] mom and dad." Kailey testified that, instead of remaining in Illinois, she decided to "return to Texas to begin counseling and *** other services" that TDFPS and DCFS required of her as a result of their investigations. According to Kailey, she decided to return to Texas to complete the services instead of staying in Illinois because her "parents were trying to talk [her] into divorcing [her] husband" and she "didn't have [any]where [else] to go" in Illinois. Kailey further testified that, if the safety plan had not been in place, she would have returned to Texas with the children, although they would have stayed with a friend instead of returning to live with respondent.

¶ 17     Kailey also testified that when she left Illinois she was "willing to sign a new [safety plan] electronically," and, at that time, F.G. and M.G. "ha[d] clothes to wear," "ha[d] adequate shelter at [her] parent's house," and neither child had any "immediate medical concerns." Kailey also testified that F.G.'s last dentist appointment had been on June 26, 2019, the day before respondent had spanked the children, and that while she was in Illinois, Kailey was looking for dentists to treat F.G.'s cavities because F.G. complained her teeth "were sensitive" and she was "in pain." Additionally, Kailey testified that, although she had not given her parents "any sort of medical consent" for the Foxes to seek dental or emergency medical care for the children, she did leave insurance cards with Doretta in the expectation that she could use the insurance cards to seek medical care "[i]n case of an emergency or something to come about." She also testified that, after she returned to Texas, she enrolled F.G. and M.G. in school in Greenview.

¶ 18     Prior to issuing its ruling, the trial court noted, "the facts relating to the abuse that was done or that was allegedly done in Texas by [respondent] [were] at the heart of th[e] case." The court also noted, "this whole case, Kailey coming back to Illinois with her children[,] occurs

- 9 -

in the context of[,] for lack of a better term[,] fleeing this situation that she must have thought was dangerous. She was concerned. She was clearly concerned." The court credited Doretta's testimony that the bruises on F.G. and M.G. were "brutal" and noted her testimony was bolstered by Kailey's actions after respondent left for work on June 27. The court also "d[id not] believe that the context of the [safety] plan being put into place contemplated that Kailey would leave the [s]tate after bringing her children to Illinois fleeing a potentially dangerous situation." The court concluded,

> "I understand that it is the law that it cannot be the sole reason for a finding of neglect that a parent has left their children in the company of a responsible relative [and] that is not what we have here. That is not the sole reason. As I said it all occurs in the context of what is arguably it [*sic*] needs to be investigated. Could be excessive corporal punishment by [respondent] in the [s]tate of Texas. So the children have some injury. The children need medical care. The children are going to go into school in the [f]all. For Kailey to leave under those circumstances in that context without a proper plan of care in this [c]ourt's judgment makes these minors neglected minors."

The court ultimately entered an order finding F.G. and M.G. were neglected in that they were "in an environment that [was] injurious to the[ir] welfare."

¶ 19        On May 26, 2020, the trial court conducted the dispositional hearing. At the beginning of the proceeding, the State informed the court the parties had "an agreement to th[e] matter" and then called a DCFS representative to testify about Kailey's and respondent's progress in completing their DCFS service plan. The DCFS representative testified that, because both Kailey and respondent had completed all of their requirements under the service plan and had been

cooperating with DCFS, "they should have custody and guardianship [of F.G. and M.G.] back to them." The representative described both Kailey and respondent as "fit, able and willing" parents, testified F.G. and M.G. were "ready" to return to their parents in Texas, and stated returning F.G. and M.G. to their parents' care would not "endanger the[ir] health, safety or welfare." The DCFS representative concluded that returning F.G. and M.G. to their parents was "in the[ir] best interest." The State then informed the court about the terms of parties' agreed disposition. The parties agreed custody and guardianship would be returned to Kailey and respondent and F.G. and M.G. would not be made wards of the court. Additionally, the parties agreed that the court would enter an order of protection containing multiple restrictions on Kailey and respondent which would continue for six months. The court entered a dispositional order and an order of protection in accordance with the parties' agreement.

¶ 20        This appeal followed.

¶ 21                              II. ANALYSIS

¶ 22        On appeal, respondent first contends the trial court erred in "finding immediate and urgent necessity" for F.G. and M.G. to be placed in shelter care. Specifically, respondent alleges the trial court "[c]ould not *** find that reasonable efforts were made to keep the children in their home[ ] because no reasonable effort was made to have the children moved to Texas." Respondent also alleges the court erred in "consider[ing] an uninvestigated and inconclusive allegation *** of abuse in Mississippi." We find respondent's contentions related to the temporary custody order to be moot.

¶ 23        At a shelter care hearing, the trial court determines if probable cause has been shown "to believe that the minor is abused, neglected or dependent." 705 ILCS 405/2-10(1), (2) (West 2018). "If the court finds that the evidence presented supports a finding of probable cause,

it must then determine whether it is consistent with the minor's health, safety, and best interests that [the minor] be released to [his or her] parents or placed in shelter care." *In re J.W.*, 386 Ill. App. 3d 847, 851-52, 898 N.E.2d 803, 807 (2008) (citing 705 ILCS 405/2-10(2) (West 2006)). Before the trial court prescribes shelter care, it must first find that:

> "it is a matter of immediate and urgent necessity for the safety and protection of the minor *** that the minor be placed in a shelter care facility ***, and must further find that reasonable efforts have been made or that, consistent with the health, safety and best interests of the minor, no efforts reasonably can be made to prevent or eliminate the necessity of removal of the minor from his or her home." 705 ILCS 405/2-10(2) (West 2018).

"Essentially, at a shelter-care hearing, the court determines whether a minor requires temporary placement outside the home." (Internal quotation marks omitted.) *J.W.*, 386 Ill. App. 3d at 852.

¶ 24 "An appeal is considered moot where it presents no actual controversy or where the issues involved in the trial court no longer exist because intervening events have rendered it impossible for the reviewing court to grant effectual relief to the complaining party." *In re J.T.*, 221 Ill. 2d 338, 349-50, 851 N.E.2d 1, 7-8 (2006). Generally, an appeal of findings made in a shelter care hearing are considered moot after "there is a subsequent adjudication of wardship supported by adequate evidence." *J.W.*, 386 Ill. App. 3d at 852. Here, respondent's appeal of the shelter care findings is moot not only for this reason, it is moot because ultimately, the children were not made wards of the court and, instead, were returned to the custody of their parents. In other words, we are unable to afford respondent effectual relief. *Id.*

¶ 25 Respondent's second contention on appeal is that the trial court erred in adjudicating F.G. and M.G. neglected. Specifically, respondent argues the court's finding was

unsupported because "the corporal punishment inflicted in Texas was not unreasonable" and because "Kailey left the children with her parents *** in accordance with DCFS direction."

¶ 26    "[T]he only question to be resolved at an adjudicatory hearing is whether or not a child is neglected, and not whether every parent is neglectful[.]" *In re Arthur H.*, 212 Ill. 2d 441, 467, 819 N.E.2d 734, 749 (2004). "An adjudication of neglect is to be reviewed based on the totality of the evidence." *In re A.W., Jr.*, 231 Ill. 2d 241, 261, 897 N.E.2d 733, 745 (2008). "On review, a trial court's finding of neglect will not be reversed unless it is against the manifest weight of the evidence. [Citation.] A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. [Citation.]" *In re A.P.*, 2012 IL 113875, ¶ 17, 981 N.E.2d 336.

¶ 27    For purposes of the Juvenile Court Act, the term "neglect" means "the failure to exercise the care that circumstances justly demand," and the definition includes "wil[l]ful as well as unintentional disregard of duty." (Internal quotation marks omitted.) *Id.* ¶ 22. The term "neglect" is not one of "fixed and measured meaning" but, rather, "takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes." (Internal quotation marks omitted.) *Id.* In the present case, the trial court found F.G. and M.G. neglected because they were "in an environment that [was] injurious to the[ir] welfare." Like "neglect," the term "injurious environment" lacks a concise definition but generally "include[s] the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." (Internal quotation marks omitted.) *Id.*

¶ 28    Here, we find the evidence presented at the adjudicatory hearing regarding the corporal punishment imposed by respondent and regarding F.G. and M.G. being left in Illinois without a proper care plan adequately supported the trial court's determination that the minors

were neglected. We disagree with respondent that the trial court was compelled to find "the corporal punishment inflicted in Texas was not unreasonable." See *In re J.P.*, 294 Ill. App. 3d 991, 1003, 692 N.E.2d 338, 345 (1998) ("[A] parent has the 'right' to corporally discipline his or her child[ ]" but the right "must be exercised in a 'reasonable' manner.' "). Here, the evidence established respondent spanked F.G. and M.G. with a belt, leaving "big bruises" and "big welts." F.G. complained that she was "hurting" and M.G. was "shaken" by his injuries. Although, during their testimony, respondent and Kailey minimized the children's injuries, denying that the children's bruises and welts were "brutal," as described by Doretta, Kailey's actions after respondent meted out the corporal punishment indicates otherwise. Kailey's actions of removing herself and the children from the family's home without telling respondent and then reporting respondent to TDFPS suggest that the punishment was of a more serious nature and that the children were more severely harmed by respondent's actions than either parent acknowledged during the adjudicatory hearing. Additionally, the evidence presented at the adjudicatory hearing demonstrates that the children were neglected because Kailey left them in Illinois without a proper care plan. Although, as respondent notes, Kailey left F.G. and M.G. in her parents' home, which had been approved by DCFS, Kailey left no instructions for her parents or DCFS regarding the children's medical needs and did not authorize her parents to seek medical treatment for the children. Kailey left without even ensuring Doretta could treat F.G.'s multiple cavities even though F.G. had complained her teeth "were sensitive" and she was "in pain." Even after Kailey returned to Texas, she and respondent refused to grant Doretta a "temporary guardianship or something so that the[ ] children had a proper care plan" and could receive any necessary medical care. Accordingly, the trial court's finding that F.G. and M.G. were neglected minors was not against the manifest weight of the evidence.

¶ 29                                    III. CONCLUSION

¶ 30          For the reasons stated, we affirm the trial court's judgment.

¶ 31          Affirmed.