NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241362-U

NOS. 4-24-1362, 4-24-1363 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 10, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| In re J.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Whiteside County |
| Petitioner-Appellee, | ) | No. 24JA20 |
| v.  (No. 4-24-1362) | ) | |
| Doreen M.S., | ) | |
| Respondent-Appellant). | ) | |
| | ) | |
| | ) | No. 24JA21 |
| *In re* J.E., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.  (No. 4-24-1363) | ) | Honorable |
| Doreen M.S. | ) | Tionn F. Carter, |
| Respodent-Appellant). | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Presiding Justice Harris and Justice Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding the trial court's neglect and dispositional findings were not against the manifest weight of the evidence.

¶ 2    Respondent-guardian, Doreen M.S., appeals the adjudicatory and dispositional orders related to two minors previously in her care, J.M. (born June 2010) and J.E. (born December 2007). On appeal, respondent argues the trial court erred when it adjudicated the minors neglected and abused and placed guardianship and custody of them with the Illinois Department of Children and Family Services (DCFS). For the reasons that follow, we affirm.

¶ 3                    I. BACKGROUND

¶ 4           A. Amended Petitions for Adjudication of Wardship

¶ 5           In June 2024, the State filed amended petitions for adjudication of wardship, alleging, in pertinent part, the minors were neglected and abused. In support of its allegations, the State asserted, in part, the minors were subject to an environment injurious to their welfare because respondent allowed her uncle to continue to have access to the minors despite knowing he had sexually molested J.M. and attempted to solicit and groom J.E.

¶ 6                    B. Adjudicatory Hearing

¶ 7           In August 2024, the trial court held an adjudicatory hearing. The State presented a forensic interview of J.E., testimony from a DCFS child protection specialist, and photographs of daily journal entries made by respondent's uncle. The State also presented certified copies of criminal records showing respondent's uncle was charged in 2020 with sexually abusing J.M. and charged in 2024 with sexually assaulting J.E. And last, the State presented certified copies of criminal records showing respondent was charged in 2024 with two counts of permitting the sexual abuse of a child. Respondent, against the advice of her counsel, elected to testify. The following pertinent information is gleaned from the evidence presented.

¶ 8           The minors previously resided with respondent, who was 70 years old at the time of the hearing, respondent's adult son, who was the father of J.E., and another child of respondent's son. Respondent explained she was raised by her uncle and his wife. When she was 15 years old, she was sexually abused by her uncle. Respondent testified the abuse "totally affected me." She also testified she was aware of "what [he] is capable of." Respondent explained she maintained a relationship with her uncle because she promised her mother she "would try to take care of him for her."

¶ 9        In 2020, respondent's uncle was charged with sexually abusing J.M. Respondent attended court hearings and attorney meetings with her uncle. She explained she did so because he had hearing difficulties and needed assistance.

¶ 10        From 2021 to early 2024, respondent would take the minors to her uncle's home. Respondent testified DCFS told her J.M. could not go into her uncle's home and, as a result, she had J.M. stay in the vehicle when they were at her uncle's home. Respondent testified she took the minors to her uncle's home approximately four to five times after he was arrested and did not leave them in his care without her supervision. J.E., in her forensic interview, suggested they were often taken to the uncle's home. The DCFS child protection specialist testified respondent's uncle disclosed an incident where respondent left J.M. in his care after 2020. The DCFS child protection specialist also testified respondent's son had indicated he was aware of his mother taking the minors to the uncle's home "on a regular basis." The detailed journal entries of respondent's uncle indicate respondent repeatedly took the minors to his home. Respondent testified the journal entries were "[m]ost likely" false.

¶ 11        In 2021, respondent's uncle began sending messages and gifts of a sexual nature to J.E. The messages detailed sex acts he wanted to do to J.E. The gifts included underwear, bras, and sex toys. J.E. told respondent about the messages and gifts, to which respondent told her to throw them away. Respondent testified she confronted her uncle and told him to stop sending inappropriate messages.

¶ 12        Respondent explained she would take the minors with her to her uncle's home to do his grocery shopping. He would provide her with a grocery list, and then she and the minors would go to the store to collect the items he needed. They would then return to his home, and she and J.E. would put the groceries away. At one point in her testimony, respondent indicated J.M.

was inside the uncle's home after getting groceries: "[Uncle] sat over on that side [of the table], I sat at the head of the table, [J.M.] sat over between me by the side of the table and [J.E.] was in the recliner." She later, however, indicated she misspoke and J.M. was not inside the home. Respondent acknowledged she and the minors continued to shop for her uncle's groceries after learning he had sent J.E. inappropriate messages and gifts.

¶ 13     In May 2024, J.E. disclosed to respondent that she had been sexually abused by respondent's uncle. Respondent took J.E. to the police department, and J.E. participated in a forensic interview. In addition to disclosing information about the messages and gifts she received from the uncle, J.E. disclosed she was sexually assaulted by him in the summer of 2022. For his conduct, the uncle ultimately pleaded guilty to a charge of sexual assault and was sentenced to a term of imprisonment.

¶ 14     Based upon this evidence, the trial court found the allegations of neglect and abuse in the petitions for adjudication of wardship had been proven. The court, in its oral pronouncement of its decisions, emphasized respondent knowingly subjected the minors to providing for the needs of the man who had sexually abused or solicited them.

¶ 15                         C. Dispositional Hearing

¶ 16     In September 2024, the trial court conducted a dispositional hearing. The court received for its consideration a dispositional report. The court also received updated information from the parties. The following pertinent information is gleaned from the dispositional report and the record presented.

¶ 17     At the time of the dispositional hearing, J.M. was in a temporary shelter but was expected to move to a residential placement in October. She was stable in her placement and attended weekly counseling. She was compliant with medications and was working toward her

mental-health goals. She had refused to attend several in-person visits with respondent. She had weekly contact with J.E.

¶ 18        J.E. was in a traditional foster home. She was doing well in her placement and attended weekly counseling. She was compliant with medications and had become more independent. She consistently attended visits with respondent and her father. J.E. enjoyed visits but often became upset by statements made during them. Her foster parents reported changes in her appearance on days she would see her family, such as wearing mismatched clothing and not wearing makeup. J.E. believed she should be involved in court and in respondent's care to make respondent happy.

¶ 19        Respondent was back home after being "in and out of the hospital a couple of times" and graduating from a "rehabilitation center." She received assistance from her son and grandson and had a "new walker and a wheelchair." She was "signing up for occupational therapy and physical therapy" and had an upcoming doctor's appointment. She was looking for new housing, as her current residence was expected to be sold in October. Respondent's scheduled weekly contact with the minors was supervised. Respondent repeatedly discussed inappropriate topics with the minors, such as pending court cases. She also made several inappropriate statements to the minors. For instance, she indicated the family dogs were having seizures due to the minors' absence. She also indicated the minors needed to attend court to have their voices heard, noting she might go to jail. It was recommended that respondent complete a mental-health assessment and parenting education and maintain stable housing. In June 2024, respondent reported she would be attending counseling and signed a release with the provider. In August 2024, respondent reported she would be attending counseling with a different provider; she had not signed a release with that provider.

¶ 20    After receiving the dispositional report and the updated information from the parties and hearing recommendations, the trial court made the minors wards of the court, found respondent was unfit to care for the minors, and placed guardianship and custody of the minors with DCFS. The court did not, however, provide the necessary factual bases for its findings in its oral pronouncement of its decisions or in its written dispositional orders.

¶ 21    D. Notices of Appeal and Appointment of Appellate Counsel

¶ 22    In October 2024, respondent filed a notice of appeal in each of the minors' cases. That same month, the trial court appointed appellate counsel to represent respondent in the appeals.

¶ 23    E. Limited Remand

¶ 24    In January 2025, this court, following the consolidation of respondent's appeals and the filing of briefs, remanded the matter for the trial court to supplement the records in each of the minors' cases with the necessary factual bases for its dispositional findings. Thereafter, the trial court filed supplements to the records, which included supplemental dispositional orders addressing the factual bases for its dispositional findings. This court then allowed the parties the opportunity to address the supplements to the records. Respondent filed a supplemental brief addressing the factual bases for the court's dispositional findings.

¶ 25    II. ANALYSIS

¶ 26    On appeal, respondent argues the trial court erred when it adjudicated the minors neglected and abused and placed custody and guardianship of them with DCFS. The State disagrees.

¶ 27    A. Timeliness of Disposition

¶ 28    As an initial matter, we must address the timeliness of this disposition. This case has been designated as accelerated pursuant to Illinois Supreme Court Rule 311 (eff. July 1, 2018).

Rule 311(a)(5) states, in relevant part, "Except for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). In this case, the need for a limited remand resulted in this decision not being issued until after the 150 day deadline had passed. Under these circumstances, we find the existence of good cause for the late disposition.

¶ 29                                    B. Adjudicatory Findings

¶ 30          Respondent argues the trial court erred when it adjudicated the minors neglected and abused. Specifically, respondent contends the court's neglect and abuse findings are against the manifest weight of the evidence.

¶ 31          Before a minor may be made a ward of the court, the minor must be found to be neglected, abused, or dependent. *In re A.P.*, 2012 IL 113875, ¶ 19. Relevant here, section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2022)) defines a "neglected minor" as including any minor "whose environment is injurious to the minor's welfare." "Neglect," furthermore, has been generally defined as the "failure to exercise the care that circumstances justly demand." (Internal quotation marks omitted.) *A.P.*, 2012 IL 113875, ¶ 22. Similarly, the term "injurious environment" has been recognized as an "amorphous concept that cannot be defined with particularity," but it includes the breach of a duty to ensure a safe and nurturing environment for a child. (Internal quotation marks omitted.) *Id.*

¶ 32          On review, a trial court's adjudicatory finding will generally not be reversed unless it is against the manifest weight of the evidence. *Id.* ¶ 17. A court's finding is against the manifest weight of the evidence where the "opposite conclusion is clearly evident." *Id.*

¶ 33          In this case, the trial court received evidence indicating respondent knew her uncle had been (1) charged with sexually abusing J.M. and (2) sending messages and gifts of a sexual

nature to J.E. The court also received evidence indicating respondent, despite this knowledge, continued to take the minors to her uncle's home and had them assist with getting his groceries. As the trial court found, the evidence, therefore, shows respondent knowingly subjected the minors to providing for the needs of the man who had sexually abused or solicited them. Given this information, we cannot say it is clear the trial court should have reached the opposite conclusions with respect to its neglect findings based upon an injurious environment. That is, we find the court's neglect findings are not against the manifest weight of the evidence.

¶ 34    We note *In re L.M.*, 319 Ill. App. 3d 865 (2001), relied upon by respondent in support of her argument, is distinguishable. In that case, the appellate court reversed the trial court's order adjudicating the minor neglected, finding the fact the minor was left in the care of her father, a known sex offender, did not, in the absence of other factors, establish an injurious environment. *Id.* at 868-69. Unlike *L.M.*, respondent knowingly subjected the minors to providing for the needs of the man who had sexually abused or solicited them.

¶ 35    Because we find the trial court's neglect findings are not against the manifest weight of the evidence, we need not consider the court's abuse findings. See *In re Faith B.*, 216 Ill. 2d 1, 15 (2005) ("Because of our conclusion regarding neglect based on injurious environment, we need not review the circuit court's additional finding that the minors were abused or neglected based on physical abuse.").

¶ 36    C. Dispositional Findings

¶ 37    Respondent argues the trial court erred when it placed custody and guardianship of the minors with DCFS. Specifically, respondent contends the court's wardship and unfitness findings are against the manifest weight of the evidence.

¶ 38    After a minor is found to be neglected, abused, or dependent, the trial court must

determine

> "whether it is in the best interests of the minor and the public that the minor be made a ward of the court, and, if the minor is to be made a ward of the court, the court shall determine the proper disposition best serving the health, safety and interests of the minor and the public." 705 ILCS 405/2-22(1) (West 2022).

If the court determines the guardian of a minor made a ward of the court is unfit to care for the minor and the health, safety, and best interests of the minor will be jeopardized if the minor remains in the custody of the minor's guardian, it may place custody and guardianship of the minor with DCFS. *Id.* § 2-27(1).

¶ 39 On review, a trial court's dispositional findings of fact will not be reversed unless they are against the manifest weight of the evidence. *In re J.W.*, 386 Ill. App. 3d 847, 856 (2008). Again, a court's finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident. *A.P.*, 2012 IL 113875, ¶ 17.

¶ 40 In this case, the trial court received information indicating the minors were stable in their placements and receiving services, while respondent was recovering from health issues and looking for new housing, as her current residence was expected to be sold soon. The court also received information indicating respondent had been recommended services, including parenting education. The need for parenting education is particularly evident given respondent (1) knowingly subjected the minors to providing for the needs of the man who had sexually abused or solicited them and (2) discussed inappropriate topics with the minors and made inappropriate statements to them during supervised visits. Given this information, we cannot say it is clear the court should have reached the opposite conclusions with respect to any of its dispositional findings of fact. That is, we find the court's dispositional findings are not against the manifest weight of the evidence.

¶ 41                                    III. CONCLUSION

¶ 42          For the reasons stated, we affirm the trial court's judgments.

¶ 43          Affirmed.