No. 2--08--0065      Filed: 6-4-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re IVAN H. and MARIFER H., Minors | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| | ) | |
| | ) | Nos. 06--JA--117 |
| | ) | 06--JA--118 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. Jaqueline M., | ) | Raymond D. Collins, |
| Respondent-Appellant). | ) | Judge, Presiding. |

PRESIDING JUSTICE BYRNE delivered the opinion of the court:

The grandmother of the minors, Ivan H. and Marifer H. (a/k/a Maria), reported that Maria had been sexually abused by Jorge G., the live-in paramour of the mother, respondent, Jaqueline M. The trial court ultimately adjudicated the minors neglected based on a finding that respondent had not tried to prevent contact between the minors and Jorge, as directed by the Department of Children and Family Services (DCFS). However, the court also found that the State failed to prove the underlying sexual abuse allegations.

Respondent appeals the adjudication of neglect, arguing in various ways that the order must be reversed because the sexual abuse allegations were based entirely on Maria's out-of-court statements, which were neither corroborated nor subjected to cross-examination as required by section 2--18(4)(c) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2--18(4)(c) (West 2006)).

Respondent alternatively argues that the State failed to prove that DCFS established a safety plan, that respondent understood it, or that she violated it.

The State does not dispute that it did not introduce evidence to corroborate Maria's alleged outcry. Instead, the State resorts to procedural arguments. According to the State, the issue of the hearsay's admissibility is moot because the trial court credited evidence that respondent failed to adhere to DCFS's directive to prevent contact between Jorge and the minors. We disagree. The State failed to show probable cause that Maria had been sexually abused, and therefore the minors were adjudicated neglected based only on a finding that respondent did not follow a safety plan that never should have been implemented. We reverse the order adjudicating the minors neglected.

FACTS

DCFS took the minors into temporary custody on September 12, 2006, after the Mundelein police department submitted a hotline report that Maria had been sexually abused by Jorge, who was living with the family. At the time of the report, Ivan was six and Maria was four.

On September 14, 2006, the State filed two petitions for adjudication of wardship based on allegations that Jorge touched or placed his finger in Maria's vagina. The petitions alleged that Ivan and Maria were neglected in that they had been exposed to an injurious environment (705 ILCS 405/2--3(1)(b) (West 2006)). The petitions also alleged that the minors were abused in that they faced a substantial risk of physical injury (705 ILCS 405/2--3(2)(ii) (West 2006)). The petition directed toward Maria additionally alleged that she was an abused minor because she had already suffered physical injury (705 ILCS 405/2--3(2)(i) (West 2006)) and because respondent had allowed a sex crime to be committed against Maria (705 ILCS 405/2--3(2)(iii) (West 2006)).

At the shelter-care hearing, Robert Musial, the DCFS caseworker assigned to the family, testified that on September 9, 2006, the Mundelein police department reported that it suspected that Maria had been sexually abused by Jorge. According to Musial, the minors' grandmother brought Maria to the police station that day and Detective Katie Smith interviewed Maria. Referring to a police report, Musial testified that Maria told Detective Smith that Jorge had "touched her private parts with his hand, and inserted his fingers into her" four times. Maria called her vaginal area "pochita" and identified the area on a body chart. Maria specified that one instance of abuse occurred in a bedroom while Jorge was living with the family. Maria reported that she saw something red in her underwear one time after she had been touched or penetrated.

Musial further testified that Robert Schnabel, a child protective investigator who was on call at the time of the report, went to the grandmother's home the next day, on September 10, 2006. Maria was not there, so Schnabel went to Condell Hospital, where Ivan was being treated for an infection in a broken arm. Ivan's injury was unrelated to the neglect or abuse allegations. Musial testified that Schnabel's notes indicate that he spoke with respondent at the hospital and "told her that [DCFS] did not want the children to have contact with Jorge during the pending report [police investigation]." Respondent was told of the allegations, and she agreed to keep the children away from Jorge while the allegations were investigated. The notes indicated that Schnabel communicated with respondent via the hospital's "interpreter line," which operates as a conference call. Respondent and Schnabel each spoke into a telephone handset and a third party in another location translated English to Spanish over the phone.

After Musial was assigned the case, Detective Smith told him that she had informed respondent that the minors were not to have any contact with Jorge, and respondent had agreed to

the directive. Musial testified that, on September 11, 2006, he was alerted to call Condell Hospital. Musial spoke with a nurse who said that Maria, Jorge, and respondent were all at the hospital visiting Ivan. Over respondent's objection, Musial testified that the nurse said that Jorge "told them not to tell anybody he was there because he was in trouble with the police." The nurse reported that Ivan was too sick to be released that evening, so respondent, Jorge, and Maria left.

The next day, on September 12, 2006, Musial went to Ivan's hospital room, where he encountered respondent and Maria. When Musial learned that Jorge was on another floor, he told respondent that "we needed to make a plan" because the minors were not to have contact with Jorge. Musial used the interpreter line to communicate with respondent, but respondent acted as though she was unaware of the allegations. When Musial pressed the issue, respondent handed him her attorney's business card and declined to speak until counsel was present. Musial contacted respondent's attorney and informed him of DCFS's position that Jorge should not be around the minors.

Respondent left and spoke with Jorge for about 20 minutes, returned to Ivan's room, and agreed to resume the conversation about the safety plan. Respondent explained that she and the minors were moving out of the grandmother's home and into an apartment that Jorge was renting for them. Musial said the arrangement was unacceptable, and respondent replied, "do what you are going to do." Musial asked respondent to identify a family member with whom the minors could be placed, but respondent refused.

On cross-examination, Musial admitted that respondent believed that the grandmother had fabricated the allegations. At the time of the shelter-care hearing, Musial believed that Jorge had not been charged with an offense, but the police investigation was ongoing. Maria had passed a cursory

medical "well-being" check, but a more thorough sexual abuse exam was scheduled in two weeks. There was no allegation that respondent or Jorge had hurt Ivan.

Without citing section 2--18(4)(c) by name, respondent's counsel asserted in closing argument that the State had not produced sufficient evidence because there was nothing to corroborate Maria's alleged outcry. Unpersuaded, the trial court entered written findings that probable cause existed that the minors were neglected and abused. The court found that Maria had reported that Jorge, who was residing with the family, had been sexually abusing her in that he touched her vagina four times. Respondent "ha[d] refused to consider that the allegations may be true and ha[d] refused to take part in a safety plan." It was in the minors' best interest to remove the children from the home and place them in shelter care. The court awarded DCFS guardianship and granted temporary custody to the minors' grandmother.

On May 23, 2007, the State amended the petitions to allege that the minors were neglected under section 2--3(1)(b) of the Act because their environment was injurious to their welfare in that, after DCFS established a safety plan, respondent violated the plan by allowing contact between Jorge and the minors.

On October 9, 2007, respondent filed a motion in limine to exclude any out-of-court statements that Maria might have made to Detective Smith. Respondent argued, as she does on appeal, that such statements, alone, are insufficient to support a finding of neglect or abuse. See 705 ILCS 405/2--18(4)(c) (West 2006).

On November 13, 2007, the trial court resumed the adjudicatory hearing by denying respondent's motion without comment. Detective Smith then testified that she interviewed Maria after her grandmother brought her to the police station. Detective Smith's testimony showed that she

was uncertain as to the date of the interview. Detective Smith testified that Maria told her that Jorge touched her "pochita," which meant vaginal area. Maria identified the area by pointing to it on herself and on a body chart. Vicky Dorjath, a Mundelein police department dispatcher, testified that she translated the conversation between respondent and Detective Smith at the police station. Following the interview with Maria, Detective Smith went to the hospital with Vorjath, who translated a conversation between Detective Smith and respondent. No written safety plan was established, but Detective Smith told respondent that Maria was "not to be around" Jorge.

Schnabel then testified that he used the interpreter line at the hospital to tell respondent that the minors were not to have contact with Jorge. Schnabel believed that respondent understood the "no-contact" condition and agreed to comply with it. However, she did not receive a copy of the directive in Spanish, so Schnabel was not "entirely sure" whether she understood it. The record does not contain a copy signed by respondent.

Musial then testified consistent with the testimony he offered at the shelter-care hearing. Musial further testified that a sexual abuse medical exam conducted since that hearing disclosed no signs of sexual abuse.

On November 13, 2007, the trial court entered an order adjudicating the minors neglected based on respondent's noncompliance with the directive to keep the minors away from Jorge. The court found that, on September 11, 2006, respondent met with Schnabel at the hospital, where a safety plan was established via the interpreter line. Respondent agreed to not allow contact between the minors and Jorge, but a few days later respondent went to the hospital with Jorge to pick up Ivan. At that time, respondent admitted going to the hospital with Maria and Jorge twice. However, the court expressly found that the State had failed to prove the counts in the petitions that alleged neglect

and abuse based on the sexual abuse itself. On December 13, 2007, respondent filed a motion to reconsider, which was denied. On January 7, 2008, the court entered an order of disposition, making the minors wards of the court and awarding DCFS legal guardianship. This timely appeal followed.

ANALYSIS

Respondent challenges the adjudication of neglect in two ways. First, she argues that the temporary custody order on which the adjudication is based is improper because Maria's out-of-court statements were not subject to cross-examination and the State failed to present evidence to corroborate her report of abuse and, therefore, there was no probable cause to grant temporary custody to DCFS and to implement a safety plan. Second, respondent argues that the State failed to prove that a safety plan existed, that respondent understood it, or that respondent violated it.

The State responds that (1) the issue of awarding DCFS temporary custody is moot and (2) the evidence showed that a safety plan existed, that respondent understood it, and that respondent violated it. We reject the State's mootness argument and conclude that no safety plan should have been implemented because the hearsay statements regarding the abuse were neither corroborated nor subject to cross-examination as required by section 2--18(4)(c) of the Act.

A. Probable Cause Finding at Shelter-Care Hearing

Respondent challenges the adjudication of neglect indirectly, arguing that the trial court's probable cause determination on which the adjudication is based is not supported by the evidence. We agree.

At a shelter-care hearing, the trial court determines whether there is probable cause to believe that a minor is abused, neglected, or dependent. 705 ILCS 405/2--10(1), (2) (West 2006). If the court finds probable cause, it must hear evidence and determine whether it is consistent with the

-7-

health, safety, and best interests of the minor that he be released to his parent or placed in shelter care. 705 ILCS 405/2--10(2) (West 2006). If the minor is to be placed in shelter care, the court must find it a matter of immediate and urgent necessity that the minor be placed in a shelter-care facility and find that either reasonable efforts have been made or no reasonable efforts can be made to prevent or eliminate the necessity of removal of the minor from his home. 705 ILCS 405/2--10(2) (West 2006). Essentially, at a shelter-care hearing, the court determines whether a minor requires temporary placement outside the home. In re Austin D., 358 Ill. App. 3d 794, 801 (2005).

Respondent argues that the State failed to prove abuse or neglect at the adjudicatory hearing because the State's evidence at the shelter-care hearing was limited to Maria's out-of-court statements that Jorge had touched her "pochita." Section 2--18(4)(c), which governs the use of a minor's hearsay statement to determine abuse or neglect, provides as follows:

"Previous statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." 705 ILCS 405/2--18(4)(c) (West 2006).

The Appellate Court, First District, has held that section 2--18(4)(c) applies to shelter-care hearings as well as adjudicatory hearings. In re M.B., 241 Ill. App. 3d 697, 706 (1992). The State concedes that Maria's out-of-court statements were neither corroborated nor subject to cross-examination at the shelter-care hearing. However, the State argues that M.B. was wrongly decided because an adjudication of neglect or abuse requires proof by a preponderance of the evidence (705 ILCS 405/1--3(1) (West 2006); In re C.S., 376 Ill. App. 3d 114, 117 (2007)), while a temporary custody order from a shelter-care hearing requires only a showing of probable cause (705 ILCS

405/2--10(1), (2) (West 2006); Austin D., 358 Ill. App. 3d at 801). We decline to depart from M.B., because section 2--18(4)(c) refers to a "finding of abuse or neglect" generally. The section does not distinguish between shelter-care hearings and adjudicatory hearings, and we will not conjure such a distinction where the General Assembly did not intend one. See People v. Hari, 218 Ill. 2d 275, 292 (2006) ("It is never proper for a court to depart from plain language by reading into the statute exceptions, limitations, or conditions which conflict with the clearly expressed legislative intent").

The State next argues that the sufficiency of the evidence presented at the shelter-care hearing is moot because "there is no relief available to respondent-mother regarding the temporary custody order at this point." We doubt that the issue is moot, but, even if it is, we should consider it under the public interest exception to the mootness doctrine.

It is a basic tenet of justiciability that reviewing courts will not decide moot or abstract questions or render advisory opinions. In re J.T., 221 Ill. 2d 338, 349 (2006). "An appeal is considered moot where it presents no actual controversy or where the issues involved in the trial court no longer exist because intervening events have rendered it impossible for the reviewing court to grant effectual relief to the complaining party." J.T., 221 Ill. 2d at 349-50. In this case, respondent has identified the reversal of the adjudication of neglect as the effectual relief that would cure error in the shelter-care hearing.

In any event, a reviewing court may nevertheless review an otherwise moot issue pursuant to the public interest exception to the mootness doctrine. J.T., 221 Ill. 2d at 350. Application of the public interest exception requires (1) the existence of a question of public importance; (2) the desirability of an authoritative determination for the purpose of guiding public officers in the performance of their duties; and (3) the likelihood that the question will recur. This exception to the

mootness doctrine is to be construed narrowly and requires a clear showing of each criterion. J.T., 221 Ill. 2d at 350. Here, the application of section 2--18(4)(c) of the Act to shelter-care proceedings is a matter of public importance, circuit court judges will benefit from guidance in making probable cause determinations based on out-of-court reports of sexual abuse, and other uncorroborated outcries of sexual abuse could cause this issue to recur. Even the most deferential review of the trial court's factual findings reveals that the court misapplied section 2--18(4)(c) of the Act. Section 2--18(4)(c) barred the finding of neglect in that Maria's hearsay report of sexual abuse, while admissible, was not sufficient in itself to support the probable cause finding of neglect, because the hearsay was uncorroborated and not subject to cross-examination. See 705 ILCS 405/2--18(4)(c) (West 2006); M.B., 241 Ill. App. 3d at 706.

### B. Adjudication of Neglect

Next, we review the adjudication of neglect in light of the State's failure to establish probable cause at the shelter-care hearing. "Neglect" is the failure to exercise the care that circumstances justly demand, and it encompasses both willful and unintentional disregard of parental duty. In re Gabriel E., 372 Ill. App. 3d 817, 822 (2007). Pursuant to section 2--3(1)(b) of the Act, a "neglected minor" includes any child under age 18 whose environment is injurious to his welfare. An "injurious environment" is "an amorphous concept that cannot be defined with particularity, but has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter" for her children. Gabriel E., 372 Ill. App. 3d at 822-23. This is because our courts have consistently recognized that a parent has a duty to keep her children free from harm. Gabriel E., 372 Ill. App. 3d at 823.

The terms "neglect" and "injurious environment" do not have fixed and measured meanings but, rather, are defined in the context of the particular circumstances of each case. Therefore, each case involving such allegations is sui generis and must be decided on its unique facts. The State has the burden of proving the allegations by a preponderance of the evidence. A trial court's finding of neglect based on an injurious environment will not be reversed unless the finding is against the manifest weight of the evidence. Gabriel E., 372 Ill. App. 3d at 823.

At the adjudicatory hearing, the trial court expressly found that the State did not prove the underlying sexual abuse allegations by a preponderance of the evidence. Thus, the court's adjudication of neglect was based entirely on a finding that respondent had failed to keep the minors away from Jorge as directed by the safety plan, even though the defects in the shelter-care hearing meant that there was insufficient evidence of sexual abuse to warrant imposing the plan in the first place. When determining the best interests of a minor, a circuit court is not limited only to considering the parent's compliance with DCFS service plans (In re Stephen K., 373 Ill. App. 3d 7, 26 (2007); In re Edward T., 343 Ill. App. 3d 778, 800 (2003)), but in this case the court focused only on respondent's noncompliance with the plan, regardless of the reasons for instituting it. The hearsay evidence of sexual abuse was insufficient in itself to support a finding of neglect, and the State presented no other evidence that Ivan or Maria was in an injurious environment.

CONCLUSION

We reject the State's position that the insufficiency of the evidence at the shelter-care proceeding is immaterial to the adjudication of neglect. The trial court's probable cause determination was the foundation on which any safety plan could be built. If we were to adopt the State's position, a flimsy allegation of abuse could be the basis for instituting an onerous safety plan,

the noncompliance with which would trigger an adjudication of neglect, which is very serious. While the best interests of the minors is paramount, adjudicating Ivan and Maria neglected based on respondent's noncompliance with an unfounded safety plan prejudiced respondent and the family as a whole. Under these circumstances, we conclude that the trial court's finding of neglect is against the manifest weight of the evidence, and we reverse the order adjudicating the minors neglected.

Reversed.

McLAREN and CALLUM, JJ., concur.