2021 IL App (2d) 210286-U
No. 2-21-0286
Order filed September 29, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* P.M., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Lee County. |
| | ) | |
| | ) | No. 21-JA-2 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. Jennifer D., | ) | Theresa Friel-Draper, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Zenoff and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's finding that the minor was neglected was not against the manifest weight of the evidence where it took judicial notice of a family court order that was still in effect finding that unsupervised contact between respondent and the minor was not in the minor's best interest and posed a serious endangerment to the minor's emotional health.  Further, the court's dispositional order was not against the manifest weight of the evidence.  Therefore, we affirmed.

¶ 2    Respondent, Jennifer D., appeals from adjudicatory and dispositional orders of the circuit court of Lee County adjudicating P.M., the minor, neglected, making him a ward of the court, and granting guardianship to the Department of Children and Family Services (DCFS).  For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    Respondent is the biological mother of the minor (born in March 2013), and Wesley M. is the minor's biological father. On January 5, 2021, Wesley passed away. The minor has autism and has not been in the care of respondent since October 2014, when the circuit court of Lee County entered an order in a family case between respondent and Wesley finding that unsupervised contact between respondent and the minor was not in the minor's best interest and posed a serious endangerment to the emotional health of the child. The minor had been living with his father and paternal grandmother at the time of his father's death, whereupon respondent had the child removed from his home and placed in her care without approval from DCFS or the court.

¶ 5    In January 2021, the State filed an amended petition for adjudication of wardship on behalf of P.M., alleging that he was neglected, in that his environment was injurious to his welfare. Specifically, the State alleged that (1) the minor was in the sole custody of his father, who is now deceased; (2) the minor has not been in the care of his mother since 2014 following a court order entered on October 28, 2014, in a family case in Lee County that found that unsupervised contact between respondent and the minor was not in the best interests of the minor and posed a serious endangerment to the emotional health of the child; (3) respondent took the minor from his placement which had been made by DCFS while an investigation was pending; (4) respondent removed the minor without DCFS' knowledge or consent; and (5) respondent refused to return the minor to his placement when DCFS requested her to.

¶ 6                              A. Adjudicatory Proceedings

¶ 7    On April 26, 2021, the court held an adjudicatory hearing. Ivory DeJesus testified that she was a child protection investigator for DCFS. She became involved with the instant matter after DCFS received a hotline call on January 13, 2021. The caller relayed that the minor's father passed away on January 5, 2021, that the minor was residing in the home with his paternal grandmother,

Sharon, who suffered from dementia and was unable to care for the minor, and that there was another person residing in the home that was "possibly using or dealing drugs." DeJesus explained that the minor had autism, was not toilet trained, and had limited verbal skills. She stated that the minor would "answer some questions, [but] some questions, he won't. Sometimes it's unclear if he understands those questions."

¶ 8    DeJesus interviewed Sharon, who told her that the minor's father had passed away from unknown causes and that she had resided in the home with the minor and his father for approximately two years. Sharon denied suffering from dementia and denied that there was any drug dealing or drug use in the home. She informed DeJesus that respondent was the minor's mother, but that respondent did not have custody because respondent had "mental health issues." DCFS allowed the minor to remain in the care of his grandmother while its investigation was ongoing.

¶ 9    DeJesus testified that, during the course of her investigation, she learned of a 2014 family case in Lee County involving respondent and the minor's father. Without objection, the circuit court took judicial notice of an order entered in that case on October 28, 2014. The order states that it was entered after a hearing on Wesley's petition to terminate visitation and for an emergency order of protection. There, the court made a finding that "unsupervised contact between [respondent] and the parties' minor child is not in the best interest of the child and poses a serious endangerment to the emotional health of the child." The court ordered respondent to "attend parenting education as required by Supreme Court Rule 924" and "submit to a mental health evaluation, complete all recommended treatment and follow-up." The order provided that "visitation shall be reserved." DeJesus testified that respondent did not provide any proof to DCFS that she had completed those services, and she did not provide any documentation that

showed that she could have visitation with the minor.

¶ 10    DeJesus further testified that, on January 17, 2021, DCFS received a request for a welfare check on the minor "because the person that called it in was fearful for his safety." On January 18, 2021, DCFS received additional hotline calls, including a 911 call to report that respondent "had orchestrated with two other individuals for the minor to be taken from Sharon['s] *** home."

¶ 11    DeJesus testified that on January 18, 2021, another DCFS caseworker, investigator Greg Duffy, located the minor at respondent's home, even though DCFS had not approved the minor to be there. Duffy requested documentation from respondent demonstrating that she had obtained visitation rights for the minor, but respondent was unable to provide any. Another individual at respondent's home, who was not identified, stated that they took the minor from Sharon's residence because respondent said that the minor "belongs with her."

¶ 12    DCFS took the minor into protective custody because (1) Duffy observed a bruise on the minor's right bicep, which the minor reported was caused after a male that resides with Sharon "spanked him with a belt;" (2) respondent was unable to provide any documentation showing that she had completed the required mental health evaluation and treatment or had attended a parenting class; and (3) respondent "removed the minor from the residence where he had originally resided."

¶ 13    Duffy and respondent agreed for the minor to live with the minor's paternal great-aunt, Jean, in Mt. Morris, Illinois, until respondent could provide documentation demonstrating that she had complied with the order entered by the family court. DeJesus testified that DCFS did not make any other recommendations for services at that point because it was "first requesting for that documentation to be provided before we could go forward." DeJesus also testified that DCFS made an indicated finding of a substantial risk of physical injury against Sharon and her paramour, George. DeJesus opined that the minor was neglected and that his environment was injurious to

his health.

¶ 14    DeJesus further testified that respondent told her that she began a mental health evaluation in Chicago in 2014, but she did not complete it.  Respondent signed a release form or forms so that DCFS could request respondent's records.  DeJesus sent the request for records "to some entity," but she received no response.  She was unaware whether respondent had subsequently completed a parenting education class, but she heard that respondent had since completed a mental health evaluation.  DeJesus clarified that she had not been provided with documentation that respondent had completed either the mental health evaluation or a parenting education class.

¶ 15    Respondent testified that she lived in Dixon with her fiancé, Stephen.  She was aware of the October 28, 2014, order entered in the family case.  The minor had not resided with her since 2014, and no visitation had been ordered in the family case.  She "started basically sneaking around" and "did what [she] had to do to see [the minor], such as attending play dates with her friend, Amber, and her son, at which the minor was present, or meeting the minor at the bus stop, as facilitated by respondent's daughter, who was the minor's school aid.  Respondent acknowledged the October 28, 2014, order, but stated that she did not believe that she did anything wrong because the minor's father permitted the contact.

¶ 16    Respondent testified that she completed a parenting education class twice, the first time in Will County.[1]  At that time, she provided a certificate of completion to opposing counsel in the family case, but she did not file the certificate with the court.  Later, respondent was unable to locate or obtain a copy of the certificate.  Rather than continue to search for the certificate, on March 7, 2021, she completed a second parenting class, namely "Divorcing and Divorced Parents,"

---

[1] Respondent did not indicate when she completed her first parenting class.

offered by Up to Parents, which she took on-line. She received a certificate of completion and filed it with the court in both the family case and the instant case, and a copy of the certificate was entered into evidence.

¶ 17    Respondent testified that she did not complete a mental health evaluation in 2014 after the court ordered her to do so. On March 11, 2021, which was after the State filed a petition for adjudication of wardship, Respondent completed a mental health evaluation at Sinnissippi Centers. She received a copy of the written mental health assessment and filed it in the family case. It was entered into evidence at the adjudicatory hearing. Following the evaluation, she received no recommendations for follow-up treatment, and she did not receive any diagnosis as part of the psychological evaluation. Respondent further stated that she was voluntarily participating in weekly counseling sessions as the result of having been involved in a traumatic car accident.

¶ 18    The circuit court found that the allegations of the State's petition for adjudication of wardship were proven by a preponderance of the evidence. Specifically, it found that the minor was neglected, in that his environment was injurious to his welfare, because: (1) in the family case, the court found that unsupervised contact between respondent and the minor was not in the minor's best interest and posed a serious endangerment to his emotional health; (2) respondent failed to complete a mental health evaluation and parenting education as ordered in the family case; and (3) respondent "admitted to having limited contact with the minor and to defying the court order and 'sneaking around' to see the minor." In so ruling, the court stated that it was "very concerned with [respondent's] lack of following the order *** in order to have custodial visitation [with] the child, and while the court does appreciate that she has made effort at this time, it is after the petition [for adjudication of wardship] was filed." It ordered DCFS to prepare a pre-dispositional report and set the matter for a dispositional hearing.

¶ 19                              B. Dispositional Proceedings

¶ 20     On May 24, 2021, the court held a dispositional hearing.  The parties acknowledged certain reports, including a juvenile court report from Lutheran Social Services of Illinois (LSSI) filed on May 3, 2021, a guardian *ad litem's* (GAL) report from Court Appointed Special Advocates (CASA) dated May 12, 2021, and an integrated assessment filed on May 24, 2021.  Several exhibits were admitted without objection, including respondent's certificate of completion of the "Divorcing and Divorced Parents" class, respondent's mental health evaluation report prepared at Sinnissippi Centers, and respondent's toxicology report a local hospital.

¶ 21     Respondent testified that she had received a "certificate of completion in the divorced parents class," as well as had completed the mental health evaluation offered at Sinnissippi Centers, and that no further treatment was recommended.  Respondent reiterated that she continued to voluntarily engage in weekly therapy.  Respondent testified that the minor was diagnosed with autism spectrum disorder.  After receiving the GAL report, respondent was concerned that the GAL was "under the impression" that respondent did not understand autism.  Respondent testified that her therapist offered counseling for parents of autistic children, and that it would be helpful to have a recent assessment of the minor because it would assist the therapist in helping respondent identify the characteristics of autism and how to react to them.  Respondent suggested "to everybody involved" that they participate in group therapy, and she suggested that she and her counselor would be able to participate in joint counseling sessions with the minor and his counselor.  To respondent's knowledge, DCFS had not taken steps to have joint counseling sessions occur.

¶ 22     Respondent testified that she began to plan for other services for the minor, such as therapy and counseling, through Florissa, which is an agency that provides services to autistic children.

The minor had not received those services, however, because respondent was told that LSSI needed to approve the services, but that "they don't use" Florissa or that there was no funding for it. Respondent testified that she recently informed LSSI that she would pay for the services, herself, with the proceeds from an online business selling baked goods that she recently started. She also detailed her efforts to initiate services specific to autism through Sinnissippi Centers and Florissa. Specifically, she informed the court that she spoke with someone at Florissa about proceeding with a current assessment for the minor, and she was prepared to proceed if approved by the court.

¶ 23    Concerning the minor's individual education program (IEP), respondent testified that she had reviewed his IEP, which indicated that he was receiving applied behavior analysis (ABA) therapy for his autism. However, she questioned the appropriateness of this therapy given the lack of a recent evaluation regarding his diagnosis. She testified that the most recent evaluation she had reviewed was conducted when the minor was two years old. LSSI informed her that they evaluated the minor four years ago, but respondent testified that LSSI did not provide her with a copy of the report.

¶ 24    Respondent testified that the current visitation schedule allowed her one hour of visitation with the minor every other week, as well as 1.5 hours of visitation via a Zoom video call on alternating weeks, when she did not have in-person visitation. She would often bring food and toys for the minor during the visits. Respondent testified that her visitation was supposed to be increased to 1.5 hours every other week, but she was unable to see the minor because during the most recent scheduled visit LSSI informed her that the minor may have COVID-19. Regarding the Zoom calls, respondent testified that he "does really good," although the last Zoom call was cut short after the minor's foster parent returned early, which distracted the minor. Respondent

tried to redirect the minor's attention, but she was unsuccessful in calming him after the interruption. Respondent described redirection as a technique that she has employed with the minor, who she described as easily distracted because of his autism and ADHD. She also acknowledged that the minor was sensitive to noise, and she recounted an incident when he reacted to a video that she played for him on her cell phone. He put up his arms and said, "it's too loud."

¶ 25    Concerning the living arrangements at her residence, respondent testified that the minor had his own bedroom in her home that was appropriately furnished for a child, as well as a toy room down the hall. She testified that there were no safety concerns or violence in her home, and that she was "fit, able and willing to care, protect, train, educate, supervise, and discipline" the minor.

¶ 26    Respondent testified that, subsequent to the May 2014 order, she completed an on-line parenting education class. The course lasted four hours, and she learned about co-parenting techniques, such as compromise and flexibility, and that even though the minor's father was deceased, she could apply those concepts to dealing with Sharon. The training did not offer any education specific to parenting a child with autism.

¶ 27    Respondent agreed that the minor has autism but opined that "certain characteristics that he's displaying could be [the result of] environmental" factors, and she recounted that the minor's father had died of a drug overdose in the home and that, one year prior, "the girlfriend" also died of a drug overdose in the home. She acknowledged that the minor required medical treatment for his autism and that, although she believed he would benefit from a more recent diagnosis and evaluation, she did not question the validity of his autism diagnosis. However, she asserted that the minor needed a "recent diagnosis to properly fix what's going on," and "has a lot of behaviors and characteristics that are identifiable under a different spectrum of autism that's environmental."

She stated that "a lot of it is taught, and a lot of it is environment." She continued that it is important for a child with autism to be raised in an environment where they know that "autism's okay. The stimming is okay," and she detailed that communication with an autistic child can be difficult because of differences in the way that the brain of an autistic child works. Respondent expressed concern that the minor had just been "put in front of a television" whenever he became "too hard to handle," and she pointed to his frequent recitation of television commercials. She also noted the lack of muscle development in the minor's hands, or arthrogryposis, and stated that it is a common characteristic in children with autism when their caregivers do not give them appropriate toys to build muscle tone and dexterity.

¶ 28    Gayla Raser testified that she was a child welfare specialist at LSSI. She stated the most recent IEP was from February or March 2021, but that the most current autism evaluation for the minor was from 2016. She testified that she had "quite a bit of experience working with autistic children" and opined that the minor's actions were "within the norm of autism." He was high functioning in some areas, but he was unable to describe a lot of his emotions and was sensitive to touch or sounds.

¶ 29    Raser testified that respondent contacted her regarding obtaining an evaluation through Florissa, but the minor's insurance would not cover it. Respondent stated "something about putting [the minor] on her [own] insurance." Raser further testified that respondent contacted her regarding scheduling counseling sessions through Sinnissippi that would include the minor, the minor's counselor, respondent, and respondent's counselor. There was "a problem with getting that done," however, because the individuals typically must "complete their current sessions," and then "their counselors tell us when they're appropriate to do the family therapy." She continued that a different counselor is typically used for family therapy to avoid biases between the therapists.

¶ 30    Raser testified that she had supervised visitation between respondent and the minor, and those interactions went "fairly well." She noted that respondent had "some" difficulty interacting with the minor, and she was "not really in tune to picking up his cues when he is showing his frustrations, especially like with the loud noises." Raser agreed that respondent "just doesn't know how to *** manage [the minor's] autism." Raser stated that although respondent has acknowledged to her that the minor has autism, respondent had stated that she believed the minor's "characteristics are more taught autism."

¶ 31    Raser confirmed that the minor was seeing a counselor through Sinnissippi and, although LSSI typically allows the minor's counselor to decide if reunification counseling is appropriate, the counselor had not recommended such counseling, nor had the counselor recommended an additional evaluation for the minor's autism. Raser opined that the minor's current placement was appropriate, that he was well cared for, and that he was "very much" making progress.

¶ 32    Raser further testified that respondent would benefit from the parenting course offered through Sinnissippi, more so than the course that respondent completed, because "there is actual interaction" and it concerns "parenting a child and learning different strategies for parenting a child and [managing the parent's] own stress." Respondent's evaluation through Sinnissippi recommended further counseling and case management to address her anxiety, which Raser likewise recommended.

¶ 33    After hearing argument from the parties, the court ruled that it was consistent with the health, welfare, safety, and best interests of the minor to make the minor a ward of the court. The court found that respondent was

>        "unfit at this time due to her inability to fully understand and accept [the minor's]
>        diagnosis, as well as the time that has transpired regarding her ability to have *** visits

with [the minor] which would also assist her in preparing and be[ing] able to be better in tune with [the minor's] disability. At this time, she does lack that ability and understanding of that diagnosis, which does endanger the health, safety, and well-being of the minor."

The court stated that it appreciated respondent's "willingness and *** what she's done," but it did not believe that the on-line class she completed "addresses the parenting aspect and the relationship with the child specific." The court found that DCFS had made reasonable efforts and appropriate services aimed at reunification, but that the impetus for removing the minor had not been eliminated, and that leaving the minor in respondent's home was contrary to his health, welfare, and safety. It further found that the service plan and services were reasonable and appropriate, and the court adopted the recommendations contained in the reports. It granted guardianship to DCFS and ordered respondent to continue to cooperate with DCFS, comply with the terms of the service plan, and correct the conditions that required the minor to be in care, or risk termination of her parental rights.

¶ 34    This timely appeal followed.

¶ 35                                    II. ANALYSIS

¶ 36    The Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq*. (West 2020)) sets forth a two-step process that a trial court must employ in determining whether a minor should be made a ward of the court. *In re A.W.*, 231 Ill. 2d 241, 254 (2008). In the first step, the court conducts an adjudicatory hearing on the petition for adjudication of wardship. *In re Jay H.*, 395 Ill. App. 3d 1063, 1068 (2009). There, "the court shall first consider only the question whether the minor is abused, neglected[,] or dependent." 705 ILCS 405/2-18(1) (West 2020). If the court determines that the minor is abused, neglected, or dependent, it proceeds to the second step—the dispositional

hearing, where the court determines "whether it is consistent with the health, safety[,] and best interests of the minor and the public that he be made a ward of the court." *Id.* § 2-21(2).

¶ 37     Under the Act, a neglected minor includes "any minor under 18 years of age whose environment is injurious to his or her welfare." *Id.* § 2-3(1)(b).  Generally, "neglect" is defined as the failure to exercise the care that circumstances justly demand, and it encompasses willful as well as unintentional disregard of parental duty. *In re Ivan H.*, 382 Ill. App. 3d 1093, 1100 (2008). An "injurious environment" is "an amorphous concept that cannot be defined with particularity, but it has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter" for his or her children. *Id.* at 1101.  Neither the term "neglect" nor "injurious environment" have fixed and measured meanings but, instead, are defined within the context of the particular circumstances involved in each case. *Id.*  "Cases involving an adjudication of neglect and wardship are *sui generis*, and each case must ultimately be decided on the basis of its own particular facts." *In re S.S.*, 313 Ill. App. 3d 121 (2000).

¶ 38     Proceedings for adjudication of wardship should not be undertaken lightly. *In re Arthur H.*, 338 Ill. App. 3d 1027, 1035 (2003).  The best interest of the minor is the paramount consideration whenever a petition for adjudication of wardship is brought under the Act. *In re S.S.*, 313 Ill. App. 3d at 126.  At the adjudicatory hearing, the State bears the burden of proving its allegations of neglect by a preponderance of the evidence. *Id.*  A preponderance of the evidence is that amount of evidence that "leads a trier of fact to find that the fact at issue is more probable than not." *Id.* (quoting *In re K.G.*, 288 Ill. App. 3d 728, 735 (1997)).  We will not reverse a trial court's finding of neglect based on an injurious environment unless the finding is against the manifest weight of the evidence. *In re Ivan H.*, 382 Ill. App. 3d, at 1101.  A finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident, or the determination

is unreasonable, arbitrary, or not based on the presented evidence. *In re D.F.*, 201 Ill. 2d 476, 498-99. Under this standard, we give deference to the trial court, as the finder of fact, because it is in a superior position to observe the conduct and demeanor of the parties and witnesses, and it has familiarity with the evidence that a reviewing court cannot possibly obtain. *Id*. As the reviewing court, we will not substitute our judgment for that of the trial court regarding witness credibility, the weight to be afforded to the evidence, or the inferences to be drawn. *Id*.

¶ 39 On appeal, respondent first argues that the State's evidence was insufficient to prove by a preponderance of the evidence that the minor was neglected because his environment was injurious to his welfare. In recounting the trial court's findings supportive of its determination that the minor was neglected, respondent asserts that the "closest [the trial court came] to supporting a finding of neglect" was its finding that, in the family case, "the [c]ourt found that contact between [respondent] and the minor poses a serious endangerment to the minor's emotional health." Respondent maintains that the State failed to satisfy its burden that the minor was neglected based on an injurious environment because it presented no evidence to support this finding, but instead "relied upon a finding made by another [c]ourt at a remote time based upon unknown evidence." Respondent continues that "this finding was not based on any evidence received at the adjudicatory hearing, but rather[,] was based upon the trial court adopting verbatim the language of an order entered over six years previously in the family court case." Although she does not contest the validity of the 2014 family court order, respondent maintains that there was no evidence to support the conclusion that contact between respondent and the minor endangered the minor's emotional health "at the time that [the family court] order was entered, let alone that this was still the case at the time of the adjudicatory hearing."

¶ 40 Respondent's argument fails. Without objection during the adjudicatory proceeding, the circuit court took judicial notice of the family court order entered on October 28, 2014. Respondent neither challenges the validity of that order nor argues that the order was no longer in effect at the time of the adjudicator hearing. She also makes no argument that it was improper for the court to take judicial notice of it. Although courts generally will not take judicial notice of the proceedings in another case, a trial court may take judicial notice of related proceedings where the parties are the same and "the outcome of the other case is determinative of some issue in the cause under consideration." *Hastings v. Gulledge*, 272 Ill. App. 3d 861, 866 (1995). Thus, "[i]f the facts of another case are readily verifiable from sources of indisputable accuracy, then they may be judicially noticed without the presentation of additional evidence if such judicial notice will aid in the efficient disposition of litigation." *Id*. See also *Aurora Loan Services, LLC v. Kmiecik*, 2013 IL App (1st) 121700, ¶ 37 (stating that a reviewing court may take judicial notice of a written decision that is part of the record of another court because such decisions are readily verifiable facts that are capable of instant and unquestionable demonstration).

¶ 41 The family court order makes plain that it was entered after a three-day hearing on Wesley's petition to terminate visitation and for an emergency order of protection, as well as that respondent was present and participated in the hearing. She was a party to the family case and fully litigated the issue of whether she posed a danger to the minor. At the conclusion of that hearing, the family court made a finding "that unsupervised contact between [respondent] and the parties' minor child is not in the best interests of the child and poses serious endangerment to the emotional health of the child." The family court reserved the issue of visitation and ordered that respondent attend parenting education, submit to a mental health evaluation, and complete all recommended treatment and follow-up.

¶ 42    Thereafter, respondent had over 6 years to comply with the order or seek modification of the October 14, 2014, order, but she did neither. Instead, by her admission, she disregarded the order and "started basically sneaking around" and "did what [she] had to do" in order to have contact with the minor, notwithstanding her clear testimony that she was aware of the order prohibiting unsupervised contact with the minor because she posed a serious endangerment to the minor's emotional health. "The purpose of judicial notice is to dispense with the normal method of producing evidence." *In re Estate of McDonald*, 2021 IL App (2d) 191113, ¶ 92. Here, because the court in the adjudicatory proceeding took judicial notice of the family court order, which was entered by a court of competent jurisdiction after a full hearing in which respondent participated, and which remained in full force and effect at the time of the adjudicatory hearing, the State was not required to relitigate the issue of whether respondent posed a danger to the minor, and the court was permitted to rely on the prior family court finding. "As a general rule, where an order is not challenged directly either by appeal or an appropriate motion for postjudgment relief, the order is conclusive, even if incorrect. [Citations.] Further, a court order typically must be obeyed, even if it is erroneous, until the order is set aside." *In re Adoption of Schumacher*, 120 Ill. App. 3d 50, 54 (1983). As the family court determined that unsupervised contact between respondent and the minor was not in the minor's best interests and posed a serious endangerment to his emotional health, and because no court found that respondent no longer posed such a danger, we cannot say the trial court's determination that the minor was neglected in that his environment was injurious to his welfare was against the manifest weight of the evidence.

¶ 43    Respondent next argues that the circuit court erred in its determination following the dispositional hearing that respondent was "unfit at this time due to her inability to fully understand and accept" the minor's diagnosis of autism such that it was in the minor's best interest to be made

a ward of the court. Respondent asserts that the court's conclusion was supported only by Raser's testimony, and she maintains that Raser was unqualified "to render an opinion regarding [respondent's] understanding of the minor's diagnosis."

¶ 44 The record belies respondent's argument that, save for Raser's testimony, no evidence supports the court's finding. We note that the finding is also directly supported by the various reports and the integrated assessment—all of which the court had the benefit of at the hearing, and all of which provided specific examples of respondent's lack of understanding or acceptance of the minor's diagnosis. For example, the GAL's report noted that, during a phone call with the GAL prior to observing respondent and the minor during a scheduled visit, respondent stated that she believed the minor's "different behavior" was due to a "lack of love" and that he would behave "normal" if he lived with her. The report stated that respondent "believes [the minor's] behavior is due to his environment and not his diagnosis of autism." Similarly, the LSSI report recommended that respondent address and receive education "on [the minor's] autism and gain[] acceptance of [the minor's] disability, and learn[] to become more in-tune to [the minor], and that it will take time." Likewise, the integrated assessment noted respondent's "belief that [the minor] is not autistic and has likely been 'trained,' " and that, "[a]t this time, it does not appear that [respondent] acknowledges [the minor's] autism diagnosis." The integrated assessment continued that this "thought process indicate[s] a level of grandiose thinking [that would] limit her ability to be empathetic to [the minor's] needs." The integrated assessment noted that respondent would "benefit from receiving psycho-education on the Autism Spectrum and explore, identify, and make changes in how she view's [the minor's] diagnosis." The court was entitled to rely on these reports because, in determining whether it is in the best interests of the minor that he be made a ward of the court, the court may rely on "[a]ll evidence helpful in determining these questions, including

oral and written reports, [which] may be admitted and may be relied upon to the extent of its probative value." 705 ILCS 405/2-22(1) (West 2020).

¶ 45 Although respondent's testimony regarding her understanding of the minor's diagnosis somewhat tempered her prior statements, she nevertheless reiterated that "a lot of [the minor's] behaviors and characteristics *** are identifiable under a different spectrum of autism that's environmental," and that "a lot of it is taught, and a lot of it is environment." Respondent also asserts that her testimony demonstrated that "she possesses a sophisticated and evolving understanding of the minor's diagnosis," as well as that she accepted the minor's diagnosis and was able to articulate her understanding of the factors she described as "environmental" or "taught," as well as how they affected the minor's progress. Inasmuch as respondent points to Raser's testimony and contrasts it with that of her own, the argument appears to challenge the court's credibility determination, to which we must give considerable deference. See *In re D.F.*, 201 Ill. 2d at 498-99. Indeed, we will not substitute our judgment for that of the trial court regarding witness credibility, the weight to be afforded to the evidence, or the inferences to be drawn. *Id.* The trial court was in the best position to weigh respondent's testimony in light of all the evidence presented, and we will not substitute our judgment for that of the trial court. Because the court was permitted to rely on any relevant and helpful information in making its dispositional decision, including the various reports and integrated assessment, it was not against the manifest weight of the evidence for the circuit court to find that it was in the minor's best interests that he be made a ward of the court.

¶ 46                                 III. CONCLUSION

¶ 47 For the reasons stated, we affirm the judgment of the circuit court of Lee County.

¶ 48 Affirmed.